Filed 6/1/15

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
    Plaintiff and Respondent, )
)         S076337
    v. )
)
EDWARD CHARLES III, )
)       Orange County
    Defendant and Appellant. )   Super. Ct. No. 94NF2611
_____)

       Defendant Edward Charles III was convicted at trial of one count of first degree murder and two counts of second degree murder (Pen. Code, § 187, subd. (a).)[1]  The jury also found true multiple-murder special-circumstance allegations. (§ 190.2, subd. (a)(3).)  Following a fourth penalty trial, the jury returned a verdict of death.  The trial court denied the automatic application to modify the verdict (§ 190.4, subd. (e)) and sentenced defendant to death.  This appeal is automatic. (§ 1239, subd. (b).)  We affirm the judgment.

---

[1]  All further unspecified statutory references are to the Penal Code.

STATEMENT OF FACTS

## 1. Guilt Phase

### A. *Summary*

Defendant was charged with killing his father, Edward Charles II, his mother, Dolores Charles, and his 19-year-old younger brother, Daniel Charles.[2] The prosecution showed that on the evening of November 6, 1994, defendant went to his parents' home around dinner time when his parents and brother were all present. Sometime later, defendant abducted Danny, stabbed him, and forced him into the trunk of Danny's car. He either choked or hit Danny in the neck with sufficient force to break his hyoid bone before killing him by striking him repeatedly in the head with a 16-inch crescent wrench. Defendant returned to his parents' house in the early morning hours of November 7, where he strangled his mother and beat his father to death with a blunt object. After cleaning up, he carried his parents' bodies to his mother's car, where he had placed Danny's body in the trunk, and went to his job at a service station, where he worked a full day. That night, he drove the car to a high school parking lot and set it on fire. He confessed his crime to his martial arts instructor, but he also attempted to persuade his 73-year-old grandfather to take the blame for the murders. In a conversation with one of his jailers and in a letter to a fellow inmate, defendant, while denying he had committed the murders, admitted he had cleaned up the murder scene at his parents' house, placed the victims' bodies in a car, and attempted to burn them.

The defense, in essence, was that defendant had neither the character nor the motive to kill his parents and brother.

---

[2] Because all the victims have the same last name we refer to them as Edward, Dolores and Danny, as Daniel was universally known.

2

### B. *Prosecution Case-in-Chief*

Defendant is the elder son of Edward and Dolores. In November 1994, defendant was 22 years old and his brother Danny was 19. Defendant worked as a mechanic at the Sunny Hills Chevron station in Fullerton; Danny was a sophomore at the University of Southern California (USC). Neither lived at his parents' home on Terraza Place in Fullerton, but their maternal grandfather, Bernard Severino, did. His room was at the opposite end of the house from the master bedroom where Edward and Dolores slept. Danny lived at USC and defendant was living with the family of his fiancée, Tiffany Bowen, who was away at school.

On Sunday, November 6, all the members of the Charles family, except defendant, had dinner together. At some point, defendant arrived. There were no arguments among the family. Severino, the sole eyewitness to the events of that evening, told police Danny left first, at about 8:00 p.m., followed shortly by defendant. About 9:00 p.m., Dolores expressed concern to Severino that Danny had not called to report he had arrived safely at USC, as was his habit. Severino last spoke to his daughter at 11:30 that night. She was still awaiting Danny's call. Severino went to bed.

Gina Simms lived on Lakeside Drive in Fullerton around the corner from the Charleses' house. About 9:30 p.m. on November 6, she was accompanying her friend Susan Poladin and Poladin's daughter from her house to their car. As they walked down the driveway the two women heard someone calling for help. The call appeared to come from the trunk of a car parked across the street. They returned to Simms's house to call the police but by the time the police arrived, the car was gone. At trial, the women identified Danny's Honda as similar to the car they saw that evening.

About 9:50 p.m., Bryan Poor, defendant's coworker at the Chevron station, saw defendant arrive in a small, light-colored sedan he had never seen defendant

drive before. Defendant told him the car belonged to Tiffany Bowen's mother, Jeanne, and he was testing the clutch or brakes. Defendant parked the car in a poorly lit area of the station. Ordinarily, he parked in front.

Jeanne Bowen testified that on November 6, she owned a gold Impala and a red Mustang, neither of which had a clutch. She also testified that, although defendant was living at her home in November 1994, he did not spend the night of November 6 there.

On Monday, November 7, 1994, Severino woke about 5:30 a.m. and went out to walk the family dog. He noticed a three-foot-long trail of blood drops in front of the steps to the house. He also observed that Dolores's car was not parked in its usual spot. About 6:10 a.m., Jerry Kuhn, who lived across the street, went out to pick up the newspaper and saw defendant using a towel or a rag to rub the Charleses' driveway. Defendant stopped when he saw Kuhn watching him. He resumed when Kuhn went back into his house, where Kuhn continued to watch defendant from a window. Defendant threw the towel or rag into the back of a truck parked in the driveway.

Defendant reported for work at the Chevron station about 8 a.m. James Burchit, the owner, said defendant was unshaven and looked like he had been up all night.

Defendant worked until 4:00 p.m. Sometime before 7:00 p.m., he returned to his parents' residence. By now Severino was concerned because his daughter and son-in-law had not been home all day. He asked defendant if he knew where they were. Defendant told him Danny had had a clutch problem with his car and his parents had gone to pick him up. Severino said he was going to call the police. Defendant left.

According to Jeanne Bowen, defendant arrived at the Bowen residence about 7:00 p.m. At around 9:00 p.m., he asked Ty Bowen, Jeanne's son, to give

4

him a ride to the Chevron station. Defendant had been driving Tiffany Bowen's truck, and it was at the residence, but Ty Bowen drove him to the station. At about 10:00 p.m., Jeanne Bowen received a phone call from someone named "Rob" who asked for Ty. She gave the phone to her son. It was defendant, and he asked Ty to pick him up at a softball field. Ty again complied.

The softball field was about sixth-tenths of a mile from El Camino High School in La Mirada where, about 10:00 p.m., Los Angeles County Sheriff's Deputy James Rifilato was dispatched to investigate a car fire. Rifilato found a gray Honda Civic smoldering in the school's parking lot. The vehicle was registered to Edward and Dolores. Rifilato looked inside the car and saw the nude, badly burned bodies of a man and a woman in the rear passenger seat. In the trunk, Rifilato found a clothed male body, less burnt than the other two. The bodies in the back seat were identified as Edward and Dolores. The body in the trunk was Danny. An arson investigator who arrived at the scene shortly after Rifilato determined the fire had been intentionally set in three locations, with gasoline used as the accelerant. Police also recovered a knife, a blue T-shirt, and a purple sweatshirt from the car.

An autopsy revealed that Danny had been stabbed twice in the back and was then either choked or struck in the neck with sufficient force to break his hyoid bone, which is located under the jaw. He was then struck in the head four times with sufficient force to fracture his skull. The cause of death was blunt force injury to the head.

Edward's autopsy revealed that his chest, back, neck, and head had been repeatedly struck, fracturing his ribs, spinal column, neck, jaw, cheek, and skull. The cause of his death was blunt force injuries to his head and neck.

The autopsy on Dolores's body revealed the cause of death was asphyxia due to neck compression. The medical examiner attributed this to strangulation or

5

a blow to her neck. An examination of the victims' stomach contents indicated Danny was killed first and then his parents, several hours later.

Sometime between 3:00 a.m. and 4:00 a.m., Leann Pollaccia was "dumpster diving" behind a business in an industrial area in Fullerton looking for items to sell. She found a 30-gallon garbage pail that held clothes and a towel soaked with blood. Pollaccia kept digging and found a wrench engraved with the yin-yang symbol.[3] There was hair and blood on the wrench but she took it anyway, leaving the clothes except for a pair of jeans, which she washed. Later, when she read newspaper accounts about the murders that identified defendant as a mechanic, she concluded the wrench was probably the weapon police were looking for, so she turned it over to the police. Kimberly Speare, defendant's former girlfriend, testified she and defendant had engraved all of his tools with the yin-yang symbol and identified the wrench as part of the set of tools they had engraved. Steve Dowell, a criminalist with the Los Angeles coroner's office whose specialties included tool mark analysis, compared the wrench to Danny's and Edward's skull injuries. He concluded an injury to Danny's skull bore marks consistent with the class of wrenches to which defendant's wrench belonged. He could not exclude it as the object that produced the injuries to Edward's skull. Heidi Robbins, the prosecution's serologist, testified that blood found on the wrench was consistent only with Danny's blood.

---

[3]     Philip Axelson, defendant's martial arts teacher, explained this symbol "depicts two fish, one usually dark and one usually white," that are "juxtaposed like two shoes in a [shoe] box" "like they are chasing each other," and "suggests positive/negative, light and dark, and basically a balance." He testified further that it was a significant symbol in martial arts and one with which defendant could have been familiar.

Los Angeles County Sheriff's Sergeant Curt Royer, the lead investigator, first spoke to defendant at the Bowens' residence at 6:15 a.m. on Tuesday, November 8. Defendant told Royer he had last seen his brother and parents on Sunday night around 8:00 p.m., when Danny left to return to USC. Defendant said he left shortly afterwards and spent the night at the Bowen residence. As to his whereabouts on Monday night, he told Royer he had arrived at the Bowen residence at 8:00 p.m. and remained there until Royer had awakened him.

Royer asked defendant why, if his brother had left his parents' residence while his parents remained there, they had been found in the same vehicle. Defendant said his brother's car had had clutch problems, so he had probably returned home and had his parents drive him to college. When Royer observed that defendant had not asked him why he was inquiring about his parents, defendant asked, "Well, why? What happened?" Royer told him his parents and brother had been found dead in a car. Defendant said he warned them not to go to the college at night. He dropped to the ground and appeared to sob but, when Royer told defendant he knew he was faking, defendant stopped.

Later that day, Royer spoke to defendant again. He told defendant that Jeanne Bowen had informed him defendant had not spent Sunday night at the Bowen residence. Defendant then remembered he had gone back to his parents' house and slept there without anyone having seen him arrive or leave.

Around 5:50 p.m. on the same day, Tuesday, defendant called Philip Axelson. Axelson had been defendant's martial arts teacher for three years, until March 1994. Defendant referred to Axelson as "sensei," the Japanese word for teacher. Under Axelson's tutelage defendant had risen to the green belt level. To achieve that level, defendant had had to be able to break two one-inch-thick boards with his feet and three with his hands. Axelson had seen defendant break as many as five boards, although he did not say whether this was with his hands or feet. At

7

that level, defendant would have been capable of inflicting a severe blow to another person's body.

Axelson was at the health club where he worked when he was told he had an emergency call. The employee who answered it told Axelson the caller had identified himself as "Eddie," and "sound[ed] really upset." When Axelson took the phone, defendant was crying. Axelson asked him "What's going on?" He told Axelson he had "done a terrible thing." Axelson asked what it was and defendant said, "I killed my family." Axelson said, "What?" and defendant said, "I think I killed my family." Axelson said, "What are you telling me? What are you saying to me?" Defendant replied, "I think I killed my family. I need to come down and talk to you right away." Axelson, concerned about the safety of other club members and employees should defendant be armed, asked for defendant's number and told him he would call him back. After getting off the phone with defendant, Axelson called the police and reported the conversation.

Axelson testified further that he and defendant had had a close relationship while defendant trained with him. Defendant conveyed the impression he hated his brother Danny, who he thought might become a homosexual because of Danny's interest in opera and theater. Defendant's feelings toward his mother were also negative; he thought that her smoking showed a lack of regard for his health. As to his father, Axelson testified there was "no love there." Defendant complained his father was distant and did not listen to him. Axelson testified that defendant demonstrated no regard for any member of his family.

Defendant was arrested for the murders on November 9, 1994.

On November 10, 1994, Heidi Robbins, a serologist with the Los Angeles County Sheriff's Department crime lab, went to the Charleses' residence. Robbins took samples of blood she found at the entrance and in the foyer, and in the master bedroom on a nightstand, a computer, the headboard, the wall above the

8

headboard, the mattress and the box spring. A pair of sparring gloves found in the dining room also had blood on them. Robbins analyzed some, but not all, of the samples she collected in the house. She concluded that blood on the nightstand was consistent with Edward's. The blood on the sparring gloves was consistent with defendant's. Robbins was also given the knife recovered from the trunk of the car where Danny's body was found. Blood on the knife was consistent with his blood.

Sometime in late November, defendant called his grandfather from jail and told him he should take the blame for the murders because he was 74 years old and had already lived his life. (Severino was actually 73.) Severino hung up on him. Defendant called back and told him that his fiancée Tiffany Bowen was pregnant and defendant had his life to lead.

On November 23, 1994, an agitated defendant asked to speak to one of his jailers at Orange County Jail, Deputy Sheriff Gene Hyatt. Defendant told Hyatt his grandfather had committed the murders. He told Hyatt that on the night of the murders his grandfather was upset because defendant's parents were bickering with Danny. Defendant said he left his parents' house before Danny did but returned around 11:30 p.m. Upon his return, he found a bloody ballpeen hammer in the kitchen, the bodies of the three victims in his parents' bedroom, and his 73-year-old grandfather in his bedroom covered with blood. Defendant decided to cover up for his grandfather. He showered the blood off his grandfather, put him into bed, and cleaned blood from the house. He put the bodies in a car parked in the driveway and then went to bed. The next evening, after working a full day, he drove the bodies to the high school parking lot, doused them with gasoline, set the car on fire and walked home.

On December 7, 1994, an inmate named Cezar Pincock approached Sergeant Royer with a letter Pincock claimed defendant had written to him. He

9

offered the letter to Royer in exchange for Royer's help in two cases, one in which Pincock had been sentenced and the other of which was pending. Royer rejected Pincock's request for help and seized the letter as evidence. Although the letter does not contain a date or defendant's name, his former girlfriend, Kimberly Speare, with whom he had lived for a year and a half, testified the writing in the letter was his.

Tony Saavedra, a reporter with the Orange County Register newspaper, obtained a copy of the letter and published an article in the newspaper on January 3, 1995, that quoted extensively from it. Before writing and publishing the piece he interviewed defendant about the letter. Saavedra held the first page of the letter up to the glass partition that separated him from defendant, and either read or held up other pages of the letter, while asking him questions about specific passages. Saavedra prefaced his questions with remarks like "You wrote here," or "You said here." At no point did defendant deny authorship of the letter. In fact, defendant clarified some of the passages that Saavedra did not understand. For example, he explained what was meant in the letter by the term "monkey boots." Saavedra also asked defendant about passages in the letter discussing the burning of the bodies. Defendant explained that he couldn't bury them, but if he burned them "it could be like cremating them." Defendant also told Saavedra that, as the bodies burned, defendant ran to a nearby baseball field and called his fiancée's brother for a ride home. Appended to the letter was a diagram of the layout of the Charles residence in which furniture was accurately positioned. It also contained information that was not in any of the police reports.

Defendant in the letter did not admit killing his family. Defendant wrote he arrived at his parents' house about 11:30 p.m. and found his parents dead. He wrote he "know[s] who did this and they left a typed note in an envelope with threats and telling me to clean up or I would go to jail for murder. They said if I

10

went to cops [*sic*], they would kill Tiffany [Bowen] and her family." He described removing the bodies, cleaning up the house, including the blood on the driveway, consistent with what his neighbor Jerry Kuhn observed. He also wrote that on the Monday night after the killings, he drove the car with the bodies to the high school, poured gasoline in the trunk and inside the car and set it on fire. Elsewhere, he suggested it would "look[] better" and deflect suspicion from him if someone—"X"—went back to his parents' residence and got "caught in the act of something. Weather [*sic*] it be M. [murder?] or steal[ing]. . . . Someone could call pigs [*sic*] and tell them X is there and is going to finish the job. X could say he missed gramps."

Defendant also proposed a possible alibi for himself for the night the murders occurred. "How about this. Sunday night I was with a girl from 7:30 pm on til 7:30 am Monday when she dropped me off at my house. She picked me up the night before at my house in a blue four door car. The only thing is who was this girl, where did you meet her, why didn't you say anything about it before . . . . [¶] [1] Who—I don't know, find someone who will say they were the girl? [¶] [2] Where—I met her at the station getting gas. [¶] [3] Why—Because I didn't want my old lady to find out. [¶] What—Well like I said I couldn't let my old lady find out."

Jill Roberson testified she had known defendant before he was arrested and had corresponded with him in jail. She testified she was going to claim defendant was with her the night of the murders. She said the false alibi was her idea. After some equivocation, she testified that, although she had discussed the idea with defendant, he told her not to do it.

11

### C. Defense Guilt Phase Case

Defendant called a number of witnesses who testified to his good character and his nonviolent nature. These witnesses also testified to the absence of any animosity by defendant toward his family that would have provided him with a motive to kill his parents and brother. William Hatch, a handwriting comparison expert, compared the jailhouse letter to exemplars of defendant's handwriting and opined that defendant had not written the letter. (The defense would argue Pincock had forged the letter based on media stories and police reports he obtained from defendant.) Three witnesses, including Jill Roberson's father, testified she was untruthful. Two witnesses testified they saw defendant driving out of the parking lot of the Chevron station at 9:00 p.m. on the night of the murders. Benjamin Romero, a Fullerton police officer, testified that when Severino was being interviewed he had trouble remembering and answering questions.

### D. Prosecution Rebuttal

In rebuttal, Sergeant Royer testified Officer Romero did not participate in Severino's interview but was simply standing nearby during the interview.

## 2. Penalty Phase

### A. Summary

For reasons set forth below, there were four penalty trials in this case. (See pt. 2.A, p. 31.) The fourth penalty trial jury returned the death verdict under review here.

### B. Prosecution Case

The prosecution's case in aggravation was based on the circumstances of the crimes and defendant's use or attempted use of force or violence. (§ 190.3, factors (a), (b)) as well as victim impact evidence.

Because the fourth penalty jury had not heard the guilt phase evidence, the prosecution presented the same evidence it had presented at that phase as evidence going to the circumstances of the crime. We do not repeat that evidence here.

Bernard Severino provided brief victim impact testimony. He testified to the character of his daughter, son-in-law, and grandson Danny, and that he missed them and suffered from loneliness as a result of their deaths.

Deputy Sheriff Frank Tomeo, who worked in the Orange County Jail, testified that, on May 5, 1995, he saw defendant come up behind another inmate, put him in a chokehold, drag him into the shower area, and then drop him, unconscious, onto the shower floor. The inmate sustained injuries that required five stitches. A second deputy sheriff, James Gagen, testified that he searched defendant's cell and found two grinding disks, two hacksaw blades, and a nine-inch piece of metal.

### C. Defense Case

Defendant called a number of witnesses who testified to his good character, his status as a role model to the boys he coached in soccer, his nonviolent nature, and the absence of anything in defendant's past or character that had prepared the witnesses for his commission of the murders. Roberta Prindiville, defendant's maternal aunt, and Joanne Irene, his second cousin, both testified that they and other members of defendant's extended family still loved him and wanted to maintain a relationship with him, notwithstanding the crimes of which he had been convicted. Norman Morein, a sentencing consultant, testified that defendant's skills as a mechanic would make him a valuable asset if he were sentenced to life in prison without possibility of parole. William Hatch, the handwriting comparison expert, again testified that, in his opinion, defendant had not authored the jailhouse letter to Cezar Pincock. Ron Klar, defendant's former attorney,

13

testified that he had gained permission for defendant to keep legal documents related to his case in jail and that all of defendant's non-legal mail was inspected before it reached defendant.

## DISCUSSION

### 1. Guilt Phase Claims

#### A. Admission of Defendant's Jailhouse Letter

Defendant contends the trial court abused its discretion when it admitted his jailhouse letter under the adoptive admission exception to the hearsay rule (Evid. Code, § 1221) and because the prosecution failed to establish the chain of custody. Additionally, he asserts application of the newsperson's shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070) limited his ability to effectively challenge the testimony of Tony Saavedra, the Orange County Register reporter, which was the basis of the court's admission of the letter into evidence. Defendant contends the improper admission of the letter violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights.[4] We reject his claims.

[4] "As to this and virtually all other appellate claims, defendant contends that an issue raised and decided in the trial court resulted in constitutional violations, but he did not present those constitutional theories below. In such instances, it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the United States and California Constitutions. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] In the latter case, no separate constitutional discussion is required or provided where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or 'gloss' raised for the first time here." (*People v. Contreras* (2013) 58 Cal.4th 123, 139, fn. 17.) We apply this principle here and elsewhere where defendant asserts on appeal constitutional claims not advanced below.

14

## 1. Evidence Code Section 402 Hearing

Before trial, the court conducted a hearing on defendant's motion to exclude from evidence the jailhouse letter defendant allegedly wrote to his fellow inmate, Cezar Pincock, about which Tony Saavedra, the reporter for the Orange County Register, later questioned defendant. The prosecutor explained that at his request, Saavedra, who had become aware of the letter and some of its contents, had held off writing a story about it until after the police had investigated whether, as the letter suggested, a "hit" had been planned against defendant's grandfather. In gratitude for his cooperation, the prosecutor gave Saavedra a copy of the letter. The prosecutor represented that Saavedra questioned defendant about the letter on his own and not at the prosecutor's instigation.

Although, as noted, the author of the letter denied having killed Edward, Dolores and Danny Charles, he described his discovery of the bodies, the cleanup efforts and the attempted disposal of the bodies by burning them. These descriptions largely tallied with what defendant told Deputy Sheriff Hyatt.[5]

The issue at the pretrial hearing was not the content of the letter but, as defense counsel put it, "whether [defendant] confessed to writing" the letter. At the outset of the hearing, the parties stipulated that the letter was received by Sergeant Royer from inmate Pincock as well as to the circumstances under which Saavedra obtained it. They stipulated further that the defense's handwriting

---

[5] Hyatt did not testify at the hearing regarding admissibility of the letter. He had, however, testified at an earlier Evidence Code section 402 hearing on the defense motion to exclude defendant's statements to him. The court denied that motion in part, permitting admission of some statements that defendant had voluntarily made to Hyatt, but not later statements Hyatt solicited from defendant. In arguing the letter corroborated defendant's statements to Hyatt, the prosecutor referred to Hyatt's testimony at this earlier hearing. Defendant did not object to the consideration of Hyatt's testimony by the trial court.

15

expert, William Hatch, had he been called at the hearing, would have testified none of the writing was in defendant's hand.

As he would at trial, Saavedra testified that he held up pages of the letter to the glass partition that separated him from defendant in the jail's visiting room and asked him questions about certain passages. In doing so, he used language like "I have a letter that you wrote," and "You said here," or "well, you wrote here." In questioning defendant he "hopscotched" around the letter. Saavedra testified that at no point did defendant admit or deny he wrote the letter, but he responded to Saavedra's questions about specific passages. Saavedra testified he was "waiting" for defendant "to disagree with what was in the letter," to say, for example, "I didn't burn my parents," but "it was quite the opposite."

The prosecutor argued that, in addition to Saavedra's testimony, the similarities between what was in the letter and what defendant told Deputy Hyatt, which the deputy had testified to at an earlier Evidence Code section 402 hearing, provided further evidence defendant had written the letter. The defense argued that the dissimilarities outweighed the similarities and that the letter was disjointed, "as though someone is getting police reports and getting more information and then writing more letters." The trial court observed the entire letter appeared to have been written by a single person, a point defense counsel did not dispute. In admitting the document into evidence the court said, "[T]here has been no suggestion of tampering, other than speculation. Certainly, you would expect that if it is in the same handwriting, if [defendant] is shown the first page and he doesn't deny it is his handwriting, that that would include the whole document."

The court questioned whether, as the defense contended, there was a "problem with the chain of custody." Defense counsel replied there was no evidence defendant had given the letter to Pincock or anyone else. Defense

16

counsel conceded, however, that the letter the prosecution gave Saavedra was the same letter Royer said Pincock had given him. The trial court rejected the chain of custody argument, concluding, "If the handwriting is the same person for all the 18 pages and . . . the defendant is shown one page of it by the reporter, and doesn't deny it under circumstances where a person ordinarily would say that, 'That not's true, I didn't write that,' or 'that's not my handwriting,' it seems that it is an implied admission as to the other 18 pages. [¶] Unless, you know, there is some evidence that there has been some tampering with those 18 pages." The court denied the motion to exclude the letter without prejudice to a further showing "that would justify excluding it."

### 2. Analysis

At the Evidence Code section 402 hearing, the admissibility of the jailhouse letter to Pincock hinged upon the preliminary factual question whether defendant authored the letter.[6] In finding that defendant did, the trial court relied on the letter itself, which it concluded had been written by a single individual, similarities between defendant's statements to Deputy Hyatt and accounts in the letter regarding defendant's efforts to clean up the murder scene and dispose of the bodies, and the testimony of Tony Saavedra about defendant's conduct when Saavedra questioned him about the letter. In the court's opinion, defendant's conduct constituted an adoptive admission of authorship.[7]

---

[6]     As relevant here, Evidence Code section 402 provides for a hearing out of the presence of the jury "[w]hen the existence of a preliminary fact is disputed . . . ." (*Id.*, § 402, subd. (a).) Evidence Code section 403 places upon the proponent of the evidence the burden of proving "the existence of the preliminary fact." (*Id.*, § 403, subd. (a).)

[7]     The court's finding of authorship was preliminary; the jury was the final arbiter of this issue. " '[T]he judge's function on questions of this sort is merely to

*(footnote continued on next page)*

Defendant challenges the trial court's conclusion that his conduct when questioned about the letter by Saavedra constituted an adoptive admission. "We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132.)

Because the adoptive admission issue involved only the authorship of the letter, not its contents, we are concerned only with whether the trial court ruled correctly that defendant's conduct in response to Saavedra's questioning constituted an adoptive admission that he wrote the letter. If so, then any incriminating statements in the body of the letter would become defendant's own statements and, as such, party admissions. (Evid. Code, § 1220.)

"In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis* (2005) 36 Cal.4th 510, 535.) "For the adoptive admission exception to the hearsay rule to apply, no 'direct accusation in so many words' is necessary. [Citation.] Rather, it is enough that the evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him

_____

*(footnote continued from previous page)*

determine whether there is evidence sufficient to permit a jury to decide the question.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 467.)

18

the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so." (*Id.* at p. 539.)

In this case, Saavedra confronted defendant with the letter that, in part, described the author's efforts to clean up the murder scene and dispose of the bodies. While Saavedra did not directly ask defendant if he had written the letter, he showed him pages of the letter and queried him about it with language that plainly attributed the letter to defendant, e.g., "You said here," "Well, you wrote here." That defendant responded to Saavedra's queries is evidence defendant heard and understood Saavedra's remarks, thus fulfilling the first prerequisite for an adoptive admission. As to the second, that the defendant by words or conduct adopt the statement as true, defendant did not deny having written the letter or in any way dissociate himself from it and its incriminating contents. To the contrary, in response to Saavedra's questions, defendant explained or illuminated passages in the letter. Accordingly, substantial evidence showed defendant heard and understood Saavedra was implicitly asserting defendant had authored the letter and, by responding to Saavedra's substantive questions regarding the contents of the letter, implicitly admitted authorship.

Moreover, in concluding defendant wrote the letter, the trial court did not rely solely on its conclusion defendant's conduct constituted an adoptive admission. The trial court also found the entire document had been written by a single person and implicitly found, as the prosecutor argued, that statements in the letter regarding the aftermath of the murders largely corroborated defendant's statements to Deputy Hyatt to which Hyatt had testified at an earlier evidentiary hearing.

We note further that at trial Kimberley Speare testified that the handwriting in the letter was defendant's. Thus authenticated as having been written by defendant, any inculpatory statements in the letter were admissible as party

19

admissions.  (Evid. Code, § 1220 ["Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . "].)  Accordingly, even if the trial court had erred in admitting the letter as an adoptive admission—which it did not—it would have been admissible on this alternative ground.  (*People v. Geier* (2007) 41 Cal.4th 555, 582 [a trial court's ruling, if correct on any ground, will be affirmed].)

Defendant challenges the trial court's ruling on four grounds.  First, he claims "the chain of custody was inadequate to show that the letter was genuine or authored by [defendant]."  The trial court appropriately rejected this claim.  The parties stipulated that the letter was the same letter Pincock had given Sergeant Royer and that the copy Saavedra showed defendant was a copy of that letter.  There was no suggestion the letter was tampered with at any point in its passage from Pincock's hands to Royer to the hearing.  Thus, as the trial court correctly observed, there is no chain of custody issue.  (See *People v. Catlin* (2001) 26 Cal.4th 81, 134.)  Defendant's claim that Pincock forged the letter after obtaining access to police reports in defendant's possession goes to the question of authorship, not to chain of custody.  As already explained, the evidence supports the conclusion that defendant wrote the letter.

Second, defendant argues that the trial court erred in admitting the letter because Saavedra admitted he showed only parts, and not the entire document, to defendant.  But as earlier noted, the trial court found the entire document was written by a single person and in a single hand.  The trial court concluded that person was defendant.

Third, defendant argues the letter did not constitute an adoptive admission because he did not admit he committed the crimes, but blamed them on a nameless third party.  The argument is both forfeited and meritless.  Defendant did not seek to exclude the letter because it did not constitute a confession; his sole argument

20

was that he did not write the letter at all.[8]  Accordingly, the argument is forfeited. His argument is meritless because it goes not to its admissibility, but to the evidentiary weight of the letter, a matter for the jury.

In sum, substantial evidence supports the trial court's foundational finding of authorship, and it did not abuse its discretion in admitting the letter into evidence.

Finally, defendant complains that Saavedra's invocation of the newsperson's shield law (Cal. Const., art. I, § 2, subd. (b); Evid. Code, § 1070) prevented him from properly challenging the admission of the letter by thwarting his ability to confront and cross-examine Saavedra in violation of his Sixth Amendment rights.  The claim is meritless.

Article I, section 2 of the California Constitution provides, as relevant to this case, that "[a] . . . reporter . . . shall not be adjudged in contempt by a judicial, legislative, or administrative body, . . . for refusing to disclose any unpublished information obtained or prepared in gathering, receiving or processing of information for communication to the public."  The constitutional provision is incorporated in the language of section 1070 of the Evidence Code.  Termed "the newsperson's shield law" (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 792), these provisions protect "a newsperson from being adjudged in contempt for refusing to disclose either: (1) unpublished information, or (2) the source of

---

**8**      On a related note, defendant complains Saavedra's guilt phase *trial* testimony that in his opinion defendant wrote the letter usurped the jury's exclusive prerogative to determine that issue.  Defendant did not advance this argument either at the pretrial evidentiary hearing or when Saavedra testified. Accordingly, the claim is forfeited.  Even if it were not, the jury was instructed that it alone was to determine whether an admission had been made.  "We presume the jury understood and followed the instruction."  (*People v. Homick* (2012) 55 Cal.4th 816, 873.)

information, whether published or unpublished." (*Id.* at p. 797.) The immunity is not absolute, however, and may in some instances yield to a criminal defendant's constitutional right to a fair trial. (*Id.* at p. 805.)

The current case involves unpublished information. In *Delaney*, we defined the term " 'unpublished information' " as encompassing "a newsperson's nonconfidential, eyewitness observations of an occurrence in a public place." (*Delaney v. Superior Court, supra*, 50 Cal.3d at p. 805.) We also set forth a number of factors to guide the trial court in balancing the interests of a criminal defendant seeking to overcome the immunity granted by the shield law with the newsperson's interests. Those factors are: (a) "whether the unpublished information is confidential or sensitive"; (b) whether "the interests sought to be protected" by the law would be thwarted by disclosure; (c) "the importance of the information to the criminal defendant"; and (d) "[w]hether there is an alternative source for the unpublished information." (*Id.* at p. 813; see *id*. at pp. 810–811.) The relative weight of these factors in a particular case is for the trial court to decide. (*Id.* at p. 813.)

At the pretrial hearing and at trial, Saavedra was represented by counsel, Mr. Grossberg. Grossberg sought to invoke the shield law to prevent defense counsel from asking Saavedra about any information he obtained from defendant about the murders that did not appear in Saavedra's published article. For example, when defense counsel asked Saavedra at the hearing whether defendant denied authorship of the letter, Grossberg objected on the grounds that "the article does not state anywhere, one way or the other, that [defendant] did or did not deny anything." The trial court overruled the objection. At another point, Grossberg objected when defense counsel asked Saavedra at the hearing if he inquired of defendant when and where the letter was written. Grossberg again argued the answer called for information not published in the article. The trial court,

22

specifically referencing the *Delaney* factors, overruled the objection. Accordingly, the trial court was clearly attuned to its obligation to weigh the competing interests in ruling on Grossberg's objections that defense counsel's questions called for unpublished information in violation of the shield law.

Defendant does not discuss the actual procedure used at the pretrial evidentiary hearing or the trial court's rulings regarding the shield law. He also fails to acknowledge that the trial court specifically referred to the *Delaney* factors in weighing Grossberg's objections to defense counsel's questioning, thus belying defendant's claim the court was unaware of its duty to balance the requirements of the shield law against defendant's right to disclosure. Instead, he globally claims Saavedra's invocation of the shield law prevented him from obtaining information that would have impeached Saavedra's credibility. He fails to direct us to a single question by defense counsel, as to which the trial court sustained an objection by Grossberg, that impeded defendant's ability to challenge Saavedra's credibility at the pretrial hearing. At oral argument, he directed us to two passages in the transcript of the hearing that he claims support his argument that invocation of the shield law thwarted his lawyer's cross-examination of Saavedra. Neither passage does so. The first passage involves a conversation between the court and counsel regarding the shield law in which the court said, "I am trying to focus on what it is that the defense might want to ask [Saavedra] which would cause [the newspaper to invoke the shield law], if that's the case." Defense counsel responded he was interested in "how they approached each other, what was said . . . you know we are going to try to find out whether [defendant] confessed to writing or didn't, and how that came about and what that means." He concluded by saying, "So I am really not going outside the four corners of that document [e.g., the newspaper article], from what I can gather in my own mind." Thus, far from restricting defense counsel's cross-examination, the trial court was simply soliciting defense

23

counsel's view of whether anything in his cross-examination might cause Grossberg to object under the shield law, to which defense counsel replied he did not believe so.

The second passage follows two objections by Grossberg when defense counsel asked Saavedra whether defendant "confirmed" writing the letter that the trial court overruled. Defense counsel then asked, "[W]hat did you do right before he supposedly confirmed he wrote these things? Tell us what you did." Grossberg objected "that that question requests information what was not published, the question of 'what did you do.' " The trial court sustained the objection. Defense counsel made no argument or offer of proof. Defendant does not explain, nor is it at all self-evident, how this exchange violated his right to confront and cross-examine Saavedra or deprived him of evidence relevant to Saavedra's credibility.

Defendant also cites a fragment of testimony by Saavedra during the first penalty trial as illustrative of the type of question that application of the shield law prevented him from asking at the pretrial hearing: "the defense was able to elicit the fact that [defendant's] responses to Saavedra's questions did not show authorship of the letter, but were in fact just general comments completely independent of the letter." But since defense counsel did not ask the same question at the pretrial hearing, we have no way of knowing whether Grossberg would have objected or how the court would have ruled. Tellingly, Grossberg did not object when the question was asked at the first penalty trial.

Finally, defendant directs us to a passage of Saavedra's testimony during the third penalty trial when, he asserts, application of the shield law was relaxed. He argues this passage demonstrates how restricted his cross-examination of Saavedra was at the guilt phase. Defense counsel asked Saavedra, "Can you distinguish in your mind whether or not the conversation you had with [defendant]

24

in January of 1995, can be split, if you will, into portions which related to this [letter] you brought with you and portions which did not relate to the [letter], but were just conversations about the case?" Grossberg, who was present, made no objection. Saavedra answered, "I think so." Saavedra then testified, "It was all together. There wasn't a definitive talk about one and then talk about the other. It was all together." Again, we fail to see, and defendant fails to explain, what bearing this exchange has on his claim that invocation of the shield law prevented him from effective cross-examination of Saavedra. Accordingly, we reject his claim.

### B. Prosecutorial Misconduct

Defendant contends three instances of prosecutorial misconduct require reversal of his convictions and sentence. We disagree.

" ' "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." . . . To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.)

Defendant first contends the prosecutor committed misconduct by presenting false evidence. Citing discrepancies between details in the jailhouse letter and the facts of the case as they emerged at trial, defendant argues the prosecutor committed misconduct by failing to investigate the possibility Pincock

forged the letter. The argument is forfeited because defendant failed to make this objection to the letter in the trial court. It is also meritless.

" 'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents . . . .' " (*People v. Harrison* (2005) 35 Cal.4th 208, 242.) Defendant has not established that the prosecution presented evidence it knew was false. The premise of his argument—that Pincock forged the letter— was rebutted by the prosecution's evidence, specifically Saavedra's testimony regarding his interview with defendant in which defendant implicitly acknowledged the letter was his and the testimony of defendant's former girlfriend, Kimberly Speare, that the letter was written in defendant's hand. This being the case, the prosecution was under no obligation to investigate whether the letter was forged and committed no misconduct in failing to do so. Such investigation was a matter for the defense. Even assuming the prosecutor should have recognized the evidence was conflicting with respect to whether defendant wrote the letter, "[w]hen . . . the prosecution has doubts as to the truth of a statement it intends to present at trial, it must disclose to the defense any material evidence suggesting that the statement in question is false. But, notwithstanding those doubts, the prosecutor may still present the statement to the jury . . . ." (*Ibid*.) Here, defendant fails to identify any material evidence the prosecutor failed to disclose. Introducing the letter into evidence was not misconduct.

Next, defendant claims the prosecutor engaged in misconduct when, during closing argument, he suggested defendant's motive in committing the murders was to make himself sole heir to his parents' estate. The defense objected to the argument on the grounds it was unsupported by the evidence. The trial court sustained the objection. The defense did not, however, ask the jury be admonished to disregard the evidence, a failure that forfeits the claim on appeal. (*People v.*

26

*Linton, supra*, 56 Cal.4th at p. 1205.)  Even if not forfeited, the prosecutor's brief remark does not rise to the level of misconduct that requires reversal under either the federal or state standard.  (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Finally, defendant asserts the prosecutor improperly denigrated defense counsel when, in closing argument, he said "I tip my hat to the job the defense did in this case when they had no evidence that went their way.  [¶]  *Trying to make chicken salad out of you know what, okay?*"  Defendant's failure to object forfeits the claim.  In any event, "[i]t was clear the prosecutor's comment was aimed solely at the persuasive force of defense counsel's closing argument, and not at counsel personally.  We have found no impropriety in similar prosecutorial remarks."  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155.)  Nor do we find any impropriety here.

### C.  Instructions

#### 1.  Motive Instruction

The jury was instructed with CALJIC No. 2.51, regarding motive, as follows:  "Motive is not an element of the crime charged and need not be shown.  However, you may consider motive or lack of motive as a circumstance in this case.  Presence of motive may tend to establish guilt.  Absence of motive may tend to establish innocence.  You will therefore give its presence or absence, as the case may be, the weight to which you find it to be entitled."

Defendant contends the instruction is unconstitutional because it allows the jury to determine guilt based wholly on evidence of motive and also shifts the burden of proof to defendants to show absence of motive to establish innocence.  "Assuming that [the first] claim affects defendant's substantial rights and therefore that we may address the claim on the merits despite defendant's failure to object at

27

trial [citation], this court has consistently rejected the claim, and defendant presents no reason for us to adopt a different course here. [Citations.] Defendant also argues that the instruction reduced the prosecutor's burden of proof by requiring defendant to prove *the absence of* a motive in order to establish his innocence. Again, assuming that this claim, which was not raised below, affects defendant's substantial rights and is therefore reviewable [citation], we reject the claim on the same basis that we have rejected it in the past." (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 474, fn. omitted.)

### 2. Consciousness of Guilt Instruction

Defendant asserts three instructions pertaining to consciousness of guilt given at his trial were "constitutionally infirm" because they allowed the jury to "convict him based on improper inferences" and were also "impermissibly argumentative."[9] We have consistently rejected identical challenges to these

---

[9]     The instructions as given were as follows:
"If you find that a defendant attempted to persuade a witness to testify falsely, such conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." (CALJIC No. 2.04.)
"If you find that an effort to procure false or fabricated evidence was made by another person for the defendant's benefit, you may not consider that effort as tending to show the defendant's consciousness of guilt unless you also find that the defendant authorized such effort. [¶] If you find defendant authorized that effort, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration." (CALJIC No. 2.05.)
"If you find that a defendant attempted to suppress evidence against himself in any manner, such as by destroying the evidence, or by concealing evidence, such attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your consideration." (CALJIC No. 2.06.)

28

instructions. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1075, and cases cited.) Defendant provides us with no persuasive reason to reconsider the issue.

### 3. Adoptive Admission Instruction

Defendant contends the trial court improperly instructed the jury on adoptive admissions because the jailhouse letter to which the instruction pertained was improperly admitted and also because, as a cautionary instruction for his benefit, it should not have been given over his objection. He asserts the instruction "focused the jury's attention on . . . the prosecution's highly improper yet highly influential letter from the informant."

Over defendant's objection, the jury was instructed with CALJIC No. 2.71.5 as follows: "If you should find from the evidence that there was an occasion when the defendant[:] one, under conditions which reasonably afforded him an opportunity to reply; two, failed to make a denial in the face of an accusation, expressly directed to him or in his presence, charging him with the crime for which such defendant now is on trial or tending to connect him with its commission; and three, that he heard the accusation and understood its nature, then the circumstance of his silence and conduct on that occasion may be considered against him as indicating an admission that the accusation thus made was true. [¶] Evidence of an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it. Unless you find that the defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you must entirely disregard the statement."

Inasmuch as we have concluded the admission of the letter was proper, we necessarily reject defendant's claim, premised on the asserted inadmissibility of the letter, that it was error to give the instruction. Defendant's remaining

29

argument—that a trial court cannot give CALJIC No. 2.71.5 should a defendant object to it—misreads *People v. Carter* (2003) 30 Cal.4th 1166, on which he relies. In *Carter*, we rejected defendant's argument that trial courts have a sua sponte duty to give CALJIC No. 2.71.5 and held "a trial court *must* give CALJIC No. 2.71.5 only when the defendant requests it." (*Carter*, at p. 1198, italics added.) *Carter* did not say that the trial court cannot give the instruction if the court determines it is warranted. To the contrary, we specifically observed: "Trial courts may certainly [give CALJIC No. 2.71.5] if they think it best to do so. But, . . . courts are *required* to so instruct only at a defendant's request." (*Ibid.*)

Accordingly, a trial court may give the instruction, whether or not defendant requests it, if it believes the instruction will be helpful to the jury. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1268 [noting that this instruction and the instruction on admissions are "intended to help the jury . . . determine" whether such admissions were made].) Moreover, as we held in *People v. Richardson* (2008) 43 Cal.4th 959, 1021, the court may do so even over a defendant's objection.

Given the letter was admitted into evidence and the jury would have to consider it, the trial court properly determined the instruction would guide the jury in assessing its evidentiary value, if any. Had the court not given the instruction, the jury might well have been left at sea regarding the relevance and significance of the letter. By implication, the trial court rejected defendant's argument that the instruction would be more prejudicial to him than beneficial to the jury. We conclude the trial court acted within its discretion in giving the instruction.

30

## 2.  Penalty Phase Claims

### A.  *Permitting a Fourth Penalty Trial*

Defendant contends the trial court abused its discretion when, pursuant to section 190.4, subdivision (b), the trial court granted the prosecution's motion for a fourth penalty trial.  We see no abuse of discretion.

Section 190.4, subdivision (b) provides in pertinent part:  "If the trier of fact [at the penalty trial] is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be.  If such new jury is unable to reach a unanimous verdict as to what the penalty shall be, the court in its discretion shall either order a new jury or impose a punishment of confinement in state prison for a term of life without the possibility of parole."

Preliminarily, we note that, although there were four penalty trials in this case, only two of them were either required by or granted as a matter of discretion under the provisions of section 190.4, subdivision (b).  Defendant's first penalty phase jury deadlocked, dividing 11 to one in favor of a death verdict.  Under the statute, the prosecution was entitled to a second penalty phase trial as a matter of right.  (*Ibid*. [providing that, if first penalty phase jury is unable to reach a verdict, the court "shall order a new jury impaneled to try the issue as to what the penalty shall be"].)  Consequently, a mistrial was declared and a second penalty phase jury impanelled.  The second penalty phase jury did not result in a hung jury.  Rather, it returned a death verdict, but that verdict was reversed by the trial court and a new trial granted based on defendant's allegation of juror misconduct.  The third penalty phase jury, required after the new trial motion was granted, deadlocked, also dividing 11 to one in favor of a death verdict.

The prosecution moved for a fourth penalty trial.  Although it was the fourth penalty trial sought, for purposes of section 190.4, subdivision (b), it would

31

have been only the second retrial of the penalty phase.**10**  Defendant opposed the motion, arguing that a fourth penalty trial was unprecedented; life in prison without parole was sufficient punishment for defendant; the prosecution's case was not "going to get any better" if a new penalty trial were granted, while the defense case would improve; and the court should consider the testimony of defendant's relatives at the prior penalty trial, which defense counsel characterized as a plea to "End this.  Let us go on with our lives."  The prosecutor responded that the nature of defendant's crimes justified the death penalty and a new penalty trial.  He also pointed out that, of the 36 jurors who had sat in the three penalty trials, 34 had voted for death.

In ruling on the motion, the trial court acknowledged that section 190.4, subdivision (b) called upon it to exercise its discretion.  The court stated it was guided by the concept of whether a new trial would be "in furtherance of justice," which required it to balance "the constitutional rights of the defendant with the interests of society as a whole as represented by the People.  It also necessitates an examination of the nature of the offense, a weighing of the evidence, consideration of the possible harassment and burdens imposed upon the defendant, and the likelihood that additional evidence will be presented at trial."

The court rejected economic considerations as a factor in deciding whether to grant a new penalty trial because "[i]t is the decision of the District Attorney to allocate public resources," and if either side requested a trial by jury, "it is the constitutional duty of the court to provide a proper forum."  The court found that consideration of the number of jurors that had voted for the death penalty—34 out

---

**10**     Thus, we do not reach, and express no opinion regarding, whether a fourth penalty trial could be granted under the statute where the three earlier trials had resulted in deadlocked juries.

of 36—was proper. The court observed that the only significant evidence in mitigation was that defendant had no prior criminal record. Regarding the circumstances of the crime, the court "determine[d] that there is substantial evidence on which a jury could base a verdict of death." The court acknowledged neither side had represented it would present new or additional evidence in a new penalty trial. It found defendant would not be prejudiced by a new penalty trial because "[h]e is not going anywhere. He will either receive the death penalty or be in prison for the rest of his life." On balance, the court concluded "legally there is no justification to deny the People's request to retry the penalty phase of the case," but cautioned, "[i]n the words of Mick Jagger, 'This could be the last time.' "

Under the standard applicable to the court's ruling on the motion under section 190.4, subdivision (b), " 'a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. McDowell* (2012) 54 Cal.4th 395, 430.)

Here, the trial court's decision was neither irrational nor arbitrary. The court carefully laid out the factors that guided its exercise of discretion, considered each one and determined, on balance, a retrial was warranted. The factors it considered were both weighty and relevant to the exercise of its discretion: whether, for example, evidence of the circumstances of the crime supported imposition of the death penalty, the numerical breakdown of jurors voting for and against the death penalty, the absence of defense evidence of more than a single factor in mitigation, and the absence of prejudice to defendant. In short, the trial court found a jury would be warranted in returning a death verdict for this horrendous crime as to which defendant offered little in the way of mitigation and as to which the overwhelming number of prior jurors had voted for death. We find no abuse of discretion in the court's ruling.

33

On appeal, defendant contends the trial court gave undue weight to the numerical breakdown of jurors voting for the death penalty. This is not accurate. As our recitation of the trial court's ruling shows, this was simply one of several factors the court considered, and one to which it did not assign dispositive or even particular weight. More broadly, defendant asserts the trial court failed to give sufficient weight to his constitutional right "to be free from undue harassment resulting from repeated or vexatious litigation." Defendant did not expressly make this argument to the trial court. Ordinarily it would be forfeited, except that the court specifically stated it had considered harassment of defendant as part of its balancing of interests. We presume that in finding no prejudice to defendant in granting the request for a fourth penalty trial, the trial court impliedly found it would not constitute harassment.

Defendant's argument to the contrary is without merit. Defendant seeks to import into section 190.4's abuse of discretion standard limitations from section 1387. "Section 1387 . . . establishes that two dismissals pursuant to section 1385, 859b, 861, 871 or 995, bar retrial on felony charges except in limited circumstances." (*People v. Hatch* (2000) 22 Cal.4th 260, 270 [noting the statute is sometimes denominated the " 'two-dismissal rule' "].) Under that statute, retrial is permitted when, for example, "substantial new evidence has been discovered by the prosecution which would not have been known through the exercise of due diligence at, or prior to, the time of termination of the action." (§ 1387, subd. (a)(1).) Defendant argues the "failure to offer new evidence is particularly important in the weighing process," as if to suggest the absence of new evidence by the prosecution should have precluded a fourth penalty trial.

We reject defendant's attempt to limit the trial court's discretion under section 190.4 with standards imposed in an entirely different statute. In the circumstances here, neither a charge nor a special circumstance finding had been

34

or would have been dismissed. Moreover, section 1387 was first enacted in 1872 while section 190.4 was first enacted in 1978. Certainly, had the Legislature wished to import standards from the former statute into the latter it could have done so, but it did not. As the trial court noted, defendant was not going anywhere, unlike a noncapital defendant who might well regain his or her liberty under the dismissal provisions of section 1387. We fail to see, and defendant fails to persuasively explain, in what manner a penalty phase retrial in the circumstances of this case constituted harassment. We affirm the trial court's ruling.

### B. Limitations on Testimony by Defendant's Family Regarding Penalty

Defendant contends the trial court erroneously excluded testimony from his relatives that his family did not wish to have the death penalty imposed upon him.[11] He asserts the evidence was admissible under section 190.3 because it related to his character. (§ 190.3 [at penalty phase evidence may be presented by either side "relevant to aggravation, mitigation, and sentence including, but not limited to" evidence of "the defendant's character, background, history, mental condition and physical condition"].) Additionally, he argues the evidence should have been admitted as "execution impact evidence" admissible to counter the prosecution's victim impact evidence.

Regarding defendant's second argument, we have consistently held that the "impact of a defendant's execution on his or her family may not be considered by the jury in mitigation." (*People v. Bennett* (2009) 45 Cal.4th 577, 601, and cases cited there.) In *Bennett*, we also rejected any construction of section 190.3 that

---

[11] The testimony was excluded before his second penalty trial. When the issue arose again before his fourth penalty trial, the trial court adopted the prior ruling.

35

would permit admission of such execution impact testimony, an argument defendant revives. (*Bennett*, at p. 602.) He fails to persuade us to reconsider our conclusions.

Regarding defendant's argument that the evidence related to his character, we have held "evidence that a family member or friend wants the defendant to live is admissible to the extent it relates to the defendant's character, but not if it merely relates to the impact of the execution on the witness." (*People v. Smith* (2005) 35 Cal.4th 334, 367.) Thus, in *Smith* we concluded the trial court erred when it excluded testimony by the defendant's tutor that death was not appropriate because, in her assessment, the defendant was essentially a child and the execution of children was inappropriate. We explained: "Because Foster had . . . a significant relationship [with defendant], and her opinion was based on a feature of defendant's character that she had personally observed (his emotional and social immaturity), we conclude that her opinion was relevant and admissible." (*Ibid.*) Unlike *Smith*, defendant fails to explain to what aspect of his character testimony by family members regarding the death penalty would have applied. Trial counsel merely argued that the fact members of defendant's family, who were also members of the victims' family, were willing to testify why they did not want defendant executed "speaks volumes about who the defendant is," and was "reflective of the kind of person they saw [him] as."

Nevertheless, even assuming the trial court erred in excluding the testimony, any error was harmless beyond a reasonable doubt. (*People v. Smith, supra*, 35 Cal.4th at p. 368 [applying the federal harmless error test, pursuant to *Chapman v. California*, *supra*, 368 U.S. 18, to the erroneous exclusion of testimony that the defendant should not receive the death penalty].) Both defendant's aunt and cousin testified they, and the rest of his family, wanted to maintain a relationship with him in the future. Obviously, a prerequisite to such a

36

continuing relationship would be that defendant remain alive. As one of defendant's attorneys observed about the scope of the trial court's ruling regarding permissible testimony by family members, "anybody with a relatively low I.Q. would be able to figure out from the testimony that the ultimate conclusion is that they don't want him to be executed." Accordingly, any error in excluding additional testimony was not prejudicial.

### C. CALJIC No. 8.88

Defendant launches familiar challenges to CALJIC No. 8.88, which addresses the jury's function in weighing the circumstances in mitigation and aggravation and in deciding the appropriate penalty. As we have consistently held with respect to these claims, the instruction is not impermissibly broad, vague or misleading, and does not fail to properly advise the jury how to determine when death is the appropriate penalty. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1111; *People v. Dykes* (2009) 46 Cal.4th 731, 816–817.)

### D. Lethal Injection

Defendant contends execution by lethal injection violates the Eighth Amendment's proscription against cruel and unusual punishment. As we have previously explained, this claim, which does not implicate the validity of the death judgment itself, but a process which may or may not exist when defendant's sentence is carried out, is premature and therefore not cognizable on appeal. (*People v. Dykes, supra*, 46 Cal.4th at p. 820; *People v. Abilez* (2007) 41 Cal.4th 472, 536.)

### E. Delay Between Death Sentence and Execution

Defendant contends the delay between his sentence and its execution attributable to the process of postconviction review violates the Eighth Amendment's proscription against cruel and unusual punishment as well as

international law.  We have consistently rejected this claim and see no reason to reconsider our earlier precedents.  " 'One under judgment of death does not suffer cruel and unusual punishment by the inherent delays in resolving his appeal.  If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while, if the judgment is affirmed, the delay has prolonged his life.' " (*People v. Richardson, supra*, 43 Cal.4th at p. 1037.)

### *F.  Constitutional Challenges to the Death Penalty Statute*

Defendant raises a number of challenges to the death penalty statute we have consistently rejected.  He fails to persuade us to reconsider our previous precedents.  Thus we again conclude:

"The death penalty statute does not unconstitutionally fail to adequately narrow the class of murderers eligible for the death penalty." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 468.)

The death penalty statute is not unconstitutional because it allows the jury to consider the circumstances of a defendant's crime under section 190.3, factor (a). (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 469.)

The death penalty statute is not unconstitutional "for failing to require proof beyond a reasonable doubt that aggravating factors exist, outweigh the mitigating factors, and render death the appropriate penalty.  [Citations.]  'The federal Constitution is not violated by the failure to require a penalty phase jury to reach unanimity on the presence of aggravating factors . . . .  [Citation.]'  [Citation.]  The high court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 and *Ring v. Arizona* (2002) 536 U.S. 584 do not change this result." (*People v. Boyce* (2014) 59 Cal.4th 672, 723–724.)  Moreover, defendant's constitutional rights were not violated by the absence of written findings by the jury regarding aggravating factors.  (*Id.* at pp. 724–725.)

"The federal Constitution does not require intercase proportionality review." (*People v. Boyce, supra*, 59 Cal.4th at p. 725.)

" 'At the penalty phase, the jury properly may consider a defendant's unadjudicated criminal activity and need not agree unanimously or beyond a reasonable doubt that the defendant committed those acts.' " (*People v. Banks* (2014) 59 Cal.4th 1113, 1207.)

" 'The use of restrictive adjectives, such as "extreme" and "substantial," in the statute's list of potential mitigating factors does not render it unconstitutional.' " (*People v. Banks, supra*, 59 Cal.4th at p. 1207.)

"The court need not instruct the jury that mitigating factors can be considered only in mitigation, or to omit mitigating factors that do not apply to defendant's case." (*People v. Boyce, supra*, 59 Cal.4th at p. 724.)

"Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants." (*People v. Williams* (2013) 58 Cal.4th 197, 295.) Consequently, the law is not unconstitutional for failing to require jurors to agree on what facts are true or important, or what aggravating circumstances apply, or to articulate reasons for selecting a death sentence. (*People v. McCurdy, supra*, 59 Cal.4th at pp. 1110–1111.)

"The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties." (*People v. Williams, supra*, 58 Cal.4th at p. 295.)

### G. Cumulative Error

Defendant contends the cumulative weight of errors occurring at his trial— particularly the admission of the jailhouse letter, the instruction concerning motive

at the guilt phase, the granting of the fourth penalty trial, and imposition of limitations on family member testimony at the penalty phase, combined with the constitutional infirmities of the death penalty statute—require reversal of his convictions and sentence. We have rejected all these claims of error with the sole exception of his argument regarding limitations on family member testimony at the penalty phase where, assuming error, we found no prejudice. Accordingly, there is neither individual nor cumulative prejudice that requires reversal.

## CONCLUSION

The judgment is affirmed.

**WERDEGAR, J.**


**WE CONCUR:**


**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Charles
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076337
**Date Filed:** June 1, 2015
_____

**Court:** Superior
**County:** Orange
**Judge:** Everett W. Dickey and William R. Froeberg

_____

**Counsel:**

R. Clayton Seaman, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne S. Denault and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

R. Clayton Seaman, Jr.
P.O. Box 12008
Prescott, AZ  86304
(928) 776-9168

Peter Quon, Jr.
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92186-5266
(619) 645-2038