Filed 1/8/16  P. v. Hodges CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ERIC CRAIG HODGES,<br><br>     Defendant and Appellant. | C076991<br><br>(Super. Ct. No. F12000474) |

A jury convicted defendant Eric Craig Hodges of attempted voluntary manslaughter with great bodily injury.  The trial court sentenced him to eight years six months in state prison.

Defendant now contends (1) his trial counsel was ineffective in failing to request a jury instruction regarding the impact of intoxication on specific intent; (2) his trial counsel was also ineffective in failing to object to prosecutorial misconduct; and (3) the cumulative effect of defense counsel's errors rendered the trial fundamentally unfair.

We conclude defendant's trial counsel was not deficient in failing to request an instruction on intoxication because there was no evidence that defendant's drinking affected his ability to formulate intent, and the instruction was inconsistent with the

1

defense theory. We also conclude defendant's trial counsel was not deficient in failing to object to prosecutorial misconduct because defendant has not established prosecutorial misconduct. Accordingly, defendant's cumulative error claim lacks merit. We will affirm the judgment.

## BACKGROUND

Defendant and his uncle, Brent Scott, were close when defendant was young but drifted apart when defendant began to drink heavily.[1] Brent had been in and out of psychiatric hospitals for 15 years, had hallucinations, and believed aliens had abducted him in the 1990's.

Brent and Susan Mann had been a couple for more than seven years. Their relationship was volatile. Brent had called the police on Susan more than five times and filed for multiple restraining orders against her. Susan had been diagnosed as bipolar.

In the late 1990's, Brent told his mother, Nancy, that he had repressed memories of his father molesting him. Shortly before the crime in this case, Brent again discussed the molestations with Nancy. Nancy got angry and the conversation devolved into an argument between Nancy and Susan. A few days later, Nancy told defendant about the argument with Susan. Defendant was very upset.

On the afternoon of November 30, 2012, Brent was sleeping and Susan was doing chores when defendant came to their home. When Susan opened the door, defendant immediately attacked her with a hammer. He got on top of her and continued to hit her with the claw end of a hammer, repeatedly saying he was going to kill her.

Brent woke up and heard someone say, "You're going to die, you fucking bitch." Brent ran to the living room and saw defendant hitting Susan with the hammer. As Brent called 911, defendant hit him in the back of the head with the claw end of the hammer.

---

[1] Because some witnesses share the same last name, we refer to individuals by their first names for clarity.

2

The two wrestled and fought. Brent eventually wrested the hammer from defendant and defendant left the home. Brent did not think defendant appeared to be under the influence of alcohol during the attack; he thought defendant "seemed to have it all together." Susan did not smell any alcohol on defendant's breath.

Susan, covered in blood, crawled to the home of her neighbor, Daniel Mathewson, and asked for help. Mathewson had heard Susan screaming and called 911. He saw defendant walking quickly to his car wearing a green top and gloves. He did not see any blood on defendant. According to Mathewson, defendant did not appear intoxicated and he was not staggering.

Two other neighbors also heard Susan screaming for help. One saw defendant leave Brent's house wearing a green shirt and latex gloves. Brent also described defendant as wearing a green shirt. Susan testified defendant was wearing a gray sweatshirt and brown leather gloves.

Susan suffered multiple broken bones in her neck and face, bruises on her arms and stomach, and knots and dents all over her head. She had reconstructive surgery on her eye and her cheekbone and jaw were replaced. She lost vision in one eye, has scars on her face, and still has pain when eating.

Officer John Herrera responded to the call at Brent's house. Brent described the hammer used in the attack as short handled with a black rubber handle with claws. After he took the hammer from defendant, Brent placed the hammer on top of a pair of his gloves in the kitchen. Brent directed Herrera to the hammer he had placed on the gloves and Herrera collected it. The hammer Herrera collected did not appear to have blood on it. At trial, Susan testified this was not the hammer used to beat her. Susan described the hammer used to attack her as "a dirty, old hammer," with a wooden handle.

Probation Officer James Amaral heard the report of the attack, saw defendant driving, and followed him. Defendant parked, got out of the car, and walked toward Amaral with his fists clenched and chest puffed. Amaral detained defendant, telling him

3

he was a suspect in a physical altercation at Brent's house. Defendant denied any knowledge of the fight and denied having been at Brent's home. He did not have any injuries or blood on him. At that time, defendant smelled slightly of alcohol, his speech was slightly slurred, and his eyes were red and watery. Amaral opined that defendant was under the influence of alcohol, but not impaired.

A couple weeks later, Officer Zack Laferriere searched defendant's car and found a pair of brown leather gloves and a green jacket with a V-neck and long sleeves. The jacket did not appear to have blood on it. Susan could not identify the gloves as the ones defendant was wearing during the attack. Both Mathewson and Brent thought the jacket looked similar to the one defendant was wearing during the attack, but each identified specific differences and neither thought it was the same jacket.

A forensic scientist, Kenton Wong, tested defendant's clothes and the hammer taken from Brent's house, for blood. There was no blood or trace evidence on the jacket. There were small amounts of blood on the tip of the hammer, defendant's jeans, T-shirt, and boxer shorts. Wong opined there would have been more blood splatter on defendant's clothes if he had beaten Susan with a hammer. On cross-examination, Wong also acknowledged that defendant could have disposed of his clothing in the approximately 10 minutes between when defendant left Brent's house and when he was detained by law enforcement.

Defendant testified he went to Brent and Susan's home to see if they would apologize for their treatment of Nancy. He and Susan began arguing about what had happened between Susan and Nancy and Susan came towards defendant, swinging at him and crying, "help, help." Defendant then saw Brent in the doorway with a hammer. Susan told Brent to "get him." Brent approached defendant and Susan grabbed defendant's collar and punched him in the back of the head. Brent swung the hammer, but defendant deflected the blow. Defendant threw punches at Brent and Brent swung the hammer at defendant another 10 to 15 times. Brent did not hit defendant with the

4

hammer, but hit Susan at least twice. Defendant eventually wrestled the hammer away from Brent. The hammer might have hit Brent's head in the process. They continued to argue about Brent's treatment of Nancy, and Brent told defendant to leave. Defendant went to his car and drove away. Defendant denied discarding any items before being stopped by Amaral.

Defendant acknowledged he drank two or three beers before going to Brent's house. He denied drinking any whiskey that day. He said he was not "buzzed" or drunk at the time of the fight.

Defendant's girlfriend, Tia Hollingsworth, testified that defendant had spent the night before the attack with her. When she got home from work on the afternoon of November 30, there were four or five empty beer bottles and an empty pint of whiskey at her house. She did not drink the alcohol and had no roommates at the time. Defendant denied drinking the additional alcohol.

Defendant had a prior conviction for battery with serious bodily injury in 2000, assault with force likely to create great bodily injury in 2002, and battery of a domestic partner in 2005. Hollingsworth had several violent encounters with defendant.

An amended information charged defendant with the attempted murder of Brent Scott and Susan Mann (Pen. Code, §§ 664, 187, subd. (a))[2] and also charged him with criminal threats (§ 422). On both attempted murder counts, the information further alleged that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) and personally used a deadly weapon (§ 12022, subd. (b)(1)).

The jury found defendant guilty of the lesser included offense of attempted voluntary manslaughter of Susan and found the great bodily injury allegation true. The jury found defendant not guilty on the other counts and found the other allegations not

---

[2] Undesignated statutory references are to the Penal Code.

true.  The trial court sentenced defendant to an aggregate term of eight years six months in state prison.

DISCUSSION

I

Defendant contends his trial counsel was ineffective in failing to request a jury instruction regarding the impact of intoxication on specific intent.

To establish a claim of ineffective assistance of counsel, defendant must prove that (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficiency resulted in prejudice to defendant.  (*People v. Maury* (2003) 30 Cal.4th 342, 389; *Strickland v. Washington* (1984) 466 U.S. 668, 686-687 [80 L.Ed.2d 674, 692-693].)  If defendant makes an insufficient showing on either one of these components, his ineffective assistance claim fails.  (*People v. Holt* (1997) 15 Cal.4th 619, 703; *Strickland,* at p. 687.)

The Supreme Court recently observed:  "It is particularly difficult to prevail on an appellate claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics omitted.)

Defendant argues the charged offenses required proof of specific intent and there was evidence he had been drinking on the morning of the attack.  Therefore, his counsel was deficient in failing to request an instruction on the impact of intoxication on specific intent.

"[E]vidence of voluntary intoxication [is] relevant on the issue of whether the defendant actually formed any required specific intent."  (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1242-1243; see § 29.4, subd. (b).)  Thus, in an attempted homicide case,

6

it may be relevant to the issues of premeditation and deliberation and intent to kill. (§ 29.4, subd. (b).)

The trial court, however, "has no duty to instruct sua sponte on voluntary intoxication. [Citation.]" (*People v. Clark* (1993) 5 Cal.4th 950, 1022, disapproved on an unrelated point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Rather, " '[a]n instruction on the significance of voluntary intoxication is a "pinpoint" instruction that the trial court is not required to give unless requested by the defendant.' [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.)

" '[A] defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication *and* the intoxication affected the defendant's "actual formation of specific intent." ' [Citation.]" (*People v. Verdugo, supra*, 50 Cal.4th at p. 295, italics added.) Substantial evidence of intoxication alone is not enough; there must also be evidence that the intoxication impaired the defendant's ability to formulate intent. (*People v. Williams* (1997) 16 Cal.4th 635, 677-678.)

Here, while there was evidence that defendant had been drinking, there was absolutely no evidence that this had any effect on his ability to formulate intent. No one who saw defendant at the time of the attack believed he was intoxicated. Brent did not think defendant was under the influence, Susan did not smell alcohol on his breath, and defendant did not appear intoxicated to Mathewson. The officers who arrested defendant shortly after the attack believed he had consumed some alcohol but was not impaired. There was no evidence defendant had any difficulty understanding the officers or communicating with them. Defendant testified that he was fully aware during the attack and not even "buzzed." If defense counsel had requested a voluntary intoxication instruction, the trial court could properly have refused it. Accordingly, the failure to request one was not ineffective assistance.

Furthermore, even if defendant were entitled to a voluntary intoxication instruction, defense counsel could have had a sound tactical reason for not requesting

7

one. First, requesting an instruction on intoxication would have undercut defendant's credibility both by suggesting he was a liar when he testified he was not "buzzed" during the fight with Brent and Susan, and also by suggesting that he was too drunk to accurately perceive or recall events. More importantly, the defense theory of the case was that defendant did not attack Susan at all. Trial counsel argued, "he's been saying all along, 'I didn't do it. They attacked me. I was trying to protect myself.' And we are not saying that he used the hammer in any way. He never touched the hammer except he touched the handle and tried to wrench . . . [Brent's] arm back with the hammer." An argument that defendant attacked Susan with the hammer but did not have the specific intent to kill her because he was intoxicated would have contradicted this theory. (See *People v. Wader* (1993) 5 Cal.4th 610, 643 [failure to request voluntary intoxication instruction was not ineffective assistance where it would have been inconsistent with defendant's theory of the case].)

Defense counsel was not deficient in failing to request a voluntary intoxication instruction.

## II

Defendant next contends his trial counsel was ineffective in failing to object to prosecutorial misconduct. He specifically contends the prosecutor committed misconduct by (A) presenting false testimony from Brent that the hammer in the kitchen was the hammer used in the attack, and (B) asking the jury in closing argument to speculate that defendant disposed of bloody clothing and gloves.

## A

We begin by addressing defendant's contention that the prosecutor committed misconduct by presenting false testimony from Brent that the hammer in the kitchen was the hammer used in the attack. " 'Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not

8

intentionally submitted.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 711 (*Avila*); see *People v. Sakarias* (2000) 22 Cal.4th 596, 633 ["a prosecutor's knowing use of false evidence or argument to obtain a criminal conviction or sentence deprives the defendant of due process"].) "Put another way, the prosecution has the duty to correct the testimony of its own witnesses that it knows, or should know, is false or misleading. [Citations.] This obligation applies to testimony whose false or misleading character would be evident in light of information known to the police involved in the criminal prosecution [citation], and applies even if the false or misleading testimony goes only to witness credibility [citations]." (*People v. Morrison* (2004) 34 Cal.4th 698, 716-717.)

Nevertheless, inconsistency in the testimony of different witnesses does not necessarily demonstrate that a witness's trial testimony was false, or that the prosecutor knew it was false. (*Avila, supra,* 46 Cal.4th at p. 712.) "[P]resenting false evidence does not violate due process; the violation consists of failure to disclose whatever other evidence there may be that the evidence presented is false." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1193.) In any event, when a witness whose testimony is alleged to be false is subjected to cross-examination and impeachment, the defendant is not denied a fair trial or due process. (*People v. Riel* (2000) 22 Cal.4th 1153, 1180-1182 (*Riel*).)

Defendant made a pretrial motion to dismiss the information based on an allegation that the prosecution failed to collect the gloves upon which Brent placed the hammer after he wrestled it away from defendant. In the course of the hearing on that motion, the prosecutor indicated she did not believe the officers "should have seized the hammer, but I guess it's better safe than sorry. It is not the People's theory that this is the hammer that did the incident." The trial court denied the motion to dismiss.

On direct examination at trial, the prosecutor showed Brent the hammer seized from the scene and asked him if the hammer was "something that you recognize or not?" Brent answered, "Yeah, that's the hammer that I retrieved from [defendant's] hand." The

9

prosecutor asked how he could be so sure and Brent answered, "Because it looks identical." On cross-examination, defense counsel showed Brent a photo of the hammer placed upon the gloves. Brent again indicated that the hammer in the picture was the hammer used in the attack. Defendant testified on cross-examination that the hammer seized from the house, and depicted in the photograph, was the hammer used by Brent to attack defendant.

Susan described the hammer used in the assault as "a dirty, old hammer," with a wooden handle. She insisted the hammer seized from their home, and depicted in the photograph, was not the hammer used to beat her, noting it "doesn't even line up with my scar or with my other wounds." The hammer had no fingerprints on it. The hammer did not appear to have blood on it, and upon further forensic testing there was only a small amount of blood on the tip of the hammer.

On this record, we cannot find that Brent lied in his testimony or that the prosecutor knew the statement was a lie and presented it anyway. Defendant and Brent both testified the hammer seized by Herrera was the hammer used in the attack. Susan testified it was not. There was only a small amount of blood on the hammer. That there was inconsistent evidence does not necessarily render Brent's testimony false. Likewise, the prosecutor's pretrial statement regarding the hammer used in the attack does not establish that the prosecution presented evidence it knew was false. (*People v. Charles* (2015) 61 Cal.4th 308, 328.)

The prosecutor was not responsible if Brent's testimony was incorrect. (*Riel, supra,* 22 Cal.4th at pp. 1211-1212.) Rather, the prosecutor's obligation was to provide the defense with discovery of known evidence contradicting Brent's statement. Even if the prosecutor knew Brent's testimony conflicted with other evidence and therefore doubted its veracity, defendant has not identified any material evidence the prosecutor failed to disclose. (*People v. Charles*, *supra*, 61 Cal.4th at p. 328.) Furthermore, defense counsel was able to fully cross-examine the witnesses and impeach their testimony.

10

When a witness whose testimony is alleged to be false is subjected to cross-examination and impeachment, the defendant is not denied a fair trial or due process. (*Riel,* at pp. 1180-1182.) Accordingly, there was no due process violation here and no ineffective assistance of counsel. (*People v. Vines* (2011) 51 Cal.4th 830, 874-875.)

B

We next turn to defendant's contention that the prosecutor committed misconduct by asking the jury in closing argument to speculate that defendant disposed of bloody clothing and gloves.

A prosecutor commits misconduct if she argues facts not in evidence during closing argument. (*People v. Bolton* (1979) 23 Cal.3d 208, 212-214.) Although the prosecutor may not argue matters outside the record, she may argue inferences from the evidence, or matters that are drawn from common experience, history, or literature. (*People v. Williams* (1997) 16 Cal.4th 153, 221.)

In closing argument, the prosecutor sought to explain the lack of blood on defendant's clothing. She argued that Susan's wounds were not "gushing blood," Susan did not immediately bleed profusely, and the couch appeared to have absorbed a lot of the blood from the attack. The prosecutor also argued, "it's likely that [defendant] ditched whatever clothing he had on." She based this argument on the fact that none of the witnesses, including Brent and Susan, identified the shirt seized from defendant's car as the shirt he was wearing at the time of the attack, and defendant had "plenty of time and opportunity to ditch" his clothing after he left Brent and Susan's home.

We do not agree with defendant's assertion that these statements amounted to prosecutorial misconduct. " ' "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]" ' " (*People v. Williams, supra,* 16 Cal.4th at p. 221.) As the prosecutor noted, none of the witnesses who were shown the green jacket recovered from

11

defendant's car identified that jacket as what defendant was wearing at the time of the attack. Amaral detained defendant approximately 10 minutes after the attack. Forensic scientist Wong testified that was a sufficient amount of time for defendant to dispose of his clothing. The prosecutor's statements in closing argument were a fair comment on the evidence and inferences from that evidence. Accordingly, there was no prosecutorial misconduct and defendant has not established ineffective assistance of counsel.

III

Defendant further contends the cumulative effect of defense counsel's errors rendered the trial fundamentally unfair. Having concluded there was no error, this claim lacks merit.

DISPOSITION

The judgment is affirmed.

_____/S/_____<br>Mauro, J.

I concur:

_____/S/_____
Duarte, J.

I concur in the result.

_____/S/_____
Blease, Acting P. J.

12