Filed 4/15/22  P. v. Wright CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078840 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. INF1702085) |
| JOHN DAVIS WRIGHT, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, John M. Davis, Judge.  Affirmed as modified with directions.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Julie L. Garland, Assistant Attorneys General, Robin Urbanski and Genevieve Herbert, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted John Davis Wright, Jr. of inflicting injury to Jane Doe (Pen. Code,[1] § 273.5, subd. (a); count 2), and found true an allegation that he personally inflicted great bodily injury on Doe (§ 12022.7).  The jury acquitted Wright of charges of premeditated attempted murder (§§ 664/187, subd. (a)) and false imprisonment (§ 236).  Wright later entered a guilty plea to making criminal threats (§ 422; count 4) after the jury was unable to return a verdict on that count.

In a separate bench trial, the court found true allegations that Wright had two strike prior convictions (§§ 667, subds. (c), (e)(1); 1170.12, subd. (c)(1)), two prior convictions within the meaning of section 667, subdivision (a), and three prior prison terms (§ 667.5, subd. (b)).  It sentenced Wright to 25 years to life on count 2, struck the additional punishment for the great bodily injury allegation, and imposed a four-year midterm on count 4, which it stayed under section 654.  The court struck the five-year enhancements for the prior prison terms.  It ordered Wright to pay various fines, fees and assessments, including a $514.58 booking fee imposed under Government Code section 29550.

Wright contends the court prejudicially abused its discretion by permitting the People to present an expert—a forensic nurse examiner—who testified without sufficient foundation that Doe had been strangled.  He further contends the judgment should be modified to credit him with 1284 days in custody.  The People concede the latter point, and we agree that it is appropriate to modify the judgment to correct the award of custody credits.  Based on changes in the law, we further vacate any portion of the booking fee that remained unpaid as of July 1, 2021.  We otherwise affirm the judgment.

---

[1]     Undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Incident*

In November 2017, Doe and Wright were in a relationship and engaged to be married. Doe lived in a house with her children in Desert Hot Springs, where Wright would sometimes stay overnight. On the morning of November 27, Doe and Wright were arguing over the volume of the television when Wright got up, charged at Doe, "picked [her] up like a rag doll" and slammed the back of her head into the wall several times. Wright yelled and screamed that Doe had made him do this, while Doe asked him to stop and asked why he was acting this way. Doe's head left three holes in the wall. She fell to the floor, where Wright kicked and stomped on her with his bare feet while she tried to protect her head.

Wright paused and paced around, repeating that Doe had made him "do this" and saying, "If you'd just shut up." Doe wanted to leave the house but could not find her cell phone. She went into the living room, when Wright started up again, "choking" her. According to Doe, "he was choking me, and I ended up on the ground, and he was choking, and choking, and, like, my head was hitting [the concrete floor]." Doe was on her back, and Wright had both hands on her neck; she remembered Wright "was sitting over me, and, like he was, like choking me, and, like while he was choking me, my head was, like, pounding on the concrete floor. And, like, I just was trying to ask him, like—or not ask him. I was screaming, like, why, like, why are you doing this? And then, like, I—he was just, like, choking, I mean bearing down as hard as he could, and I blacked out after that all."

When Doe awoke, she found she had urinated on herself. She removed her pants, put them in the wash, and went to shower. Angry, Wright came in and dragged her out. She tried to get around him but ended up cornered in

3

her bedroom, where he again banged her head into the wall. Wright slapped Doe in the face with an open hand, but then pulled his arm back and punched her "as hard as he could" in the jaw with his fist. Doe fell on the bed and slid to the floor. Wright walked away. Doe tried to leave the house, but Wright told her he was going to kill her. He pulled her back by her shirt and got her to the ground, hitting her. Wright again grabbed her neck and "kept choking [her]" "harder, and harder, and harder," repeating that he was going to kill her. Doe believed she was going to die. She described that when Wright first choked her, "he was banging—like, while he was strangling, my head was going back and forth . . . [a]nd he was still, like, strangling me [and] yelling" but "when he was strangling me the last time, he didn't say anything while he was doing it, but he was looking me dead in my eye."

Wright stopped when Doe's sister rang the doorbell. Doe jumped up and ran to her sister, crying and hysterical. They eventually left in her sister's car. Doe's sister called police.

Doe sustained a dislocated jaw, bloodshot eyes, swelling on her eyes, cheeks and lips, and bruises on her face, ribs, thighs and foot. A responding officer saw broken capillaries in her eyes, but no visible bleeding or abrasions. At the time of the attack, Doe was still healing from previous rotator cuff surgery but her rotator popped back out, necessitating another surgery. She suffered some cracked teeth, requiring dentures. Doe underwent brain surgery, and had short-term and some long-term memory loss.

*Pretrial Motion Regarding J.M. and J.M.'s Trial Testimony*

Before trial, the People moved under Evidence Code section 1250[2] to admit statements Doe made to a forensic nurse examiner, J.M., during an examination on the afternoon of the incident. Defense counsel argued the statements were inadmissible because they were given to a forensic nurse, not a medical provider over the course of medical treatment. The court ruled the statements were admissible after the prosecutor confirmed that he was seeking Doe's descriptions of physical sensations, and stated that the nurse, who was employed by Eisenhower Medical Center, was asking questions for a medical, not an investigative, purpose.

At trial, J.M. testified that as a certified forensic nurse examiner for Eisenhower Health, she worked with patients who have experienced assault, domestic violence, and strangulation. She had been a forensic nurse examiner for four years, after having received 40 hours of classroom training for sexual assault cases and 40 hours for domestic violence strangulation cases. J.M. was certified by the International Association of Forensic Nursing to conduct sexual assault exams and intimate partner violence and strangulation exams. She was familiar with medical literature dealing with

_____

[2] Evidence Code section 1250 codifies the state-of-mind exception to the hearsay rule. (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1523, fn. 4.) Evidence Code section 1250, subdivision (a) provides in part: "Subject to [Evidence Code, s]ection 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action . . . ." Under Evidence Code section 1252, "a statement of the declarant's mental or physical condition is inadmissible only if the statement was made ' "under circumstances such as to indicate its lack of trustworthiness." ' " (*Ramirez*, at p. 1523, fn. 4.)

strangulation in the forensic setting, and out of 265 forensic examinations she had conducted, she believed about half were specific to strangulation.

J.M. testified that given all of her training and experience, she was able to describe some of the common signs or symptoms of strangulation: over half of the patients had no physical outward signs on their neck that they had been strangled. She explained "they can report signs of dizziness, . . . issues with memory, issues with changes in their vision, changes in their hearing, loss of consciousness, pain, difficulty swallowing, difficulty moving their neck, their head." As to why injuries were not always present or externally visible, J.M. explained that strangulation involved compression versus blunt force trauma; she testified it was defined as the occlusion of either blood flow or air flow preventing oxygen from reaching the brain. She also described the difference between choking, involving swallowing something that blocks the airway, and strangulation, which is compression from the outside, explaining that individuals without a medical background might use the terms interchangeably. J.M. testified that a person could lose consciousness from strangulation given the lack of oxygen getting to the brain. She explained part of the brain shifts into "survival mode," meaning the parasympathetic nervous system shuts down, causing other functions, such as bladder or bowel control, to stop.

J.M. examined Doe on November 27, 2017, for about 80 minutes. Doe appeared with swelling to her face. She was weepy and somewhat unsteady on her feet, so J.M. conducted the exam with Doe on a gurney. Doe described being dizzy and lightheaded, with a headache, anxiety and slow recall. She complained of pain in her leg, left arm, right knee, face, and the back of her head. Doe had pain swallowing and general pain to her neck. Doe could not open her jaw all the way.

6

Doe reported that she lost consciousness and had a gap in her memory, indicating to J.M. that Doe suffered a lack of oxygen to her brain. The memory gap was also consistent with a loss of consciousness. Doe told J.M. she thought she had urinated on herself; J.M. testified again that loss of bladder control happens when the body is in survival mode. J.M. described the photographs she took of Doe to document her injuries.

During her exam, J.M. did not see external injuries to Doe's neck, but Doe reported pain there. J.M. did feel swelling on the back of Doe's head. J.M. did not see petechiae in Doe's eyes or the back palate of Doe's mouth. J.M. explained petechiae are micro hemorrhages where small blood vessels have broken; they are a sign that the vein that brings blood from the head back to the body has been occluded. J.M. testified that petechiae are not present in every kind of strangulation case; she agreed a person could be strangled but still not exhibit petechiae because strangulation involves pressure, and in such a case the artery that takes blood to the head was not occluded.

J.M. testified that her findings were consistent with the history Doe had provided her. Based on Doe's subjective reports, including that she had lost consciousness, experienced slow recall of information, and lost control of her bladder, as well as Doe's objective symptoms, J.M. opined that Doe was strangled. The absence of petechiae did not change J.M.'s conclusion because it was one sign of many, and by itself was not definitive. Nor was the absence of external injuries unusual given that strangulation involved compression, not blunt force trauma.

J.M. was later recalled to testify that she had had an opportunity to review results of CT scans of Doe's head, soft tissues and face/jaw, which were negative, i.e., they showed no significant injury. The results did not

7

change her opinions or conclusions, as they were consistent with her testimony that a visible injury did not correlate with strangulation. J.M. acknowledged that Doe's statements about injuries to her head and jaw were not corroborated by objective physical evidence, that is, the CT scans. She acknowledged her conclusion that Doe was strangled was also based on Doe's uncorroborated statements. But she testified her conclusions were based on her own objective observations of Doe, including Doe's demeanor, the swelling, and all of Doe's symptomology. J.M. admitted she had not seen pictures of Doe with bruising or swelling, and she agreed Doe's report about not being able to open her jaw was subjective.

*Wright's Prior Incidents of Violence*

Doe testified that Wright had choked her about three months before the incident while she was driving him to an appointment. Wright told her she was playing her music too loud, but before she could do anything he charged at her with both hands and wrapped them around her neck. Doe did not contact police or seek medical treatment out of fear; she suffered bruises around her neck and was hoarse for about a week. Doe stayed with Wright because he claimed he didn't know what happened to him and told her he would never hurt her.

Wright's former girlfriend, E.H., testified Wright was physically violent with her five times during their relationship. On one occasion Wright threw her on the ground and punched her in the eye after E.H. received a message from a male friend on a social network site. Another time, Wright dragged E.H. out of her mother's house by her hair, arm and wrist and took her to an abandoned hotel, where police later found them. Wright was convicted of kidnapping in February 2013 as a result of the latter incident.

8

*Jury Instructions*

During the jury instruction conference the court recounted its discussions with counsel regarding the use of CALCRIM No. 360, limiting the jury's use of statements considered by an expert in reaching his or her conclusions.[3] The People argued that CALCRIM No. 360 did not apply because Doe's statements were made during a medical evaluation that took place shortly after the incident. Defense counsel's position was that the statements should be considered only to evaluate the expert's opinion and that the instruction should be given. The court stated it had read CALCRIM No. 360's use notes, and ruled Doe's statements could be taken for their truth: "[Doe] was reporting, you know, I got hit here. I got hit over here. This hurts. That hurts. I got swelling here. I got swelling here. And so I believe that there's several reasons why it is admissible . . . ." The court confirmed it was not giving the instruction.

However, the court instructed the jury as to witness statements and expert testimony:

"You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may consider those statements in two ways: One, to evaluate whether the witness's testimony in court is believable; and two, as evidence that the information in those earlier statements is true.

---

[3]     CALCRIM No. 360 reads: _____<*Insert name*> testified that in reaching (his/her) conclusions as an expert witness, (he/she) considered [a] statement[s] made by _____ <*Insert name*>. [I am referring only to the statement[s] _____ <*Insert or describe statements admitted for this limited purpose*>.] You may consider (that/those) statement[s] only to evaluate the expert's opinion. Do not consider (that/those) statement[s] as proof that the information contained in the statement[s] is true."

"A witness was allowed to testify as an expert and give opinions. You must consider the opinion[s], but you're not required to accept them as true or accurate. The meaning and importance of any opinion is up to you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses in general. In addition, consider the expert's knowledge, skill, experience, training and education, the reasons that the expert gave for any opinion and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied is true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

## DISCUSSION

### I. *Admission of J.M.'s Testimony*

Wright contends the trial court prejudicially abused its discretion by allowing J.M. to testify that Doe was strangled. He maintains her testimony lacked sufficient foundation to be the basis for expert opinion, and cites authorities for the proposition that an expert's opinion may not be based on speculation or conjecture, and that an expert's opinion lacks value if its basis is "unsound." (See *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564; *People v. Lawley* (2002) 27 Cal.4th 102, 132.) Asserting J.M. gave her opinion based on what Doe told her and not objective medical evidence, he compares the case to *People v. Pollock* (2004) 32 Cal.4th 1153, in which the California Supreme Court upheld a ruling excluding expert testimony as based on self-serving and unreliable statements. He also argues that while the court ruled J.M.'s testimony admissible under Evidence Code section 1250, that "statute should not be interpreted to authorize using the statements as expert confirmation of a non-declarant's physical act against

10

the declarant." Wright points to the court's ruling concerning CALCRIM No. 360, arguing: "The combination of allowing Doe's statements to [J.M.] to be considered for all purposes, and then allowing [J.M.] to use those statements as the basis for her own expert opinion, gave the jury what amounted to expert testimony that Doe was strangled."

" ' "A person is qualified to testify as an expert if [s]he has special knowledge, skill, experience, training, or education sufficient to qualify [her] as an expert on the subject to which [her] testimony relates." [Citation.] An expert may express an opinion on "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. Anh The Duong* (2020) 10 Cal.5th 36, 60.) Further, an expert may rely on background information and knowledge accepted in their field of expertise. (*People v. Sanchez* (2016) 63 Cal.4th 665, 685; *People v. Presley* (2021) 65 Cal.App.5th 1131, 1142; *People v. Roa* (2017) 11 Cal.App.5th 428, 448.) The trial court possesses wide discretion to admit or exclude expert testimony, and we review for abuse of discretion its decision as to whether expert testimony meets the standard for admissibility. (*Anh The Duong*, at p. 60; *People v. Sanchez* (2019) 7 Cal.5th 14, 46 [" 'When expert opinion is offered, much must be left to the trial court's discretion' "]; *People v. McDowell* (2012) 54 Cal.4th 395, 426.) This includes whether the expert's testimony has the necessary foundation. (See *People v. Ramos* (1997) 15 Cal.4th 1133, 1175.) " 'The competency of an expert "is in every case a relative one, i.e., relative to the topic about which the person is asked to make his statement." ' " (*Ibid*.) Absent a manifest abuse, we will not disturb the court's determination. (*Ibid*.) A court will not abuse its discretion unless its decision " 'is so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. Charles* (2015) 61 Cal.4th 308, 333.)

Wright does not challenge J.M.'s qualifications and specialized experience as a forensic nurse examiner for domestic violence cases, or her competence to testify generally that certain symptoms and conditions (or the absence of symptoms) are common or consistent with an incident of strangulation. He does not argue that J.M.'s opinion somehow improperly invaded the province of the jury.[4] He does not argue J.M.'s opinion cannot rise to the level of substantial evidence. (Compare *Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 222 [expert opinion testimony does not achieve the dignity of substantial evidence if based on speculative, remote or conjectural factors].) His contention is that Doe's subjective description of the events of that day and her condition, uncorroborated by objective evidence of physical injury, was too speculative or unreliable to provide adequate foundation for J.M.'s opinion that Doe had been strangled on the day in question, and that the opinion "in effect, vouched for Doe's testimony." He characterizes J.M.'s opinion as relating that "Doe was telling the truth."

Wright has not shown the trial court abused its broad discretion by allowing J.M.'s opinion. J.M. did in fact rely in part on objective indicia to support her opinion, including Doe's demeanor and the swelling she observed on Doe's head. And the court could reasonably conclude that Doe's statements were sufficiently reliable to be used by J.M.—a forensic nurse who examined patient victims of domestic violence in her line of work—in forming her opinion. In Wright's main cited case, *People v. Pollock*, *supra*, 32 Cal.4th 1153, the court recited some of the relevant legal principles and explained: "Although an expert may base an opinion on hearsay, the trial

---

4      Such an argument would not succeed, as an otherwise admissible expert opinion may embrace the ultimate issue to be decided by the trier of fact. (Evid. Code, § 805; *Swanson v. Marley-Wylain Company* (2021) 65 Cal.App.5th 1007, 1019.)

court may exclude from the expert's testimony 'any hearsay matter whose irrelevance, unreliability, or potential for prejudice outweighs its probative value.' " (*Id*. at p. 1172.) In *Pollock*, that meant the court properly permitted a drug addiction expert to testify generally about the patterns of cocaine addicts while they were under the influence, and allowed the defense to ask the expert hypothetical questions, but declined to permit the expert to answer a specific question[5] based on the defendant's pretrial interview that took place four years before the event in question, stating the defendant's pretrial hearsay statements were too "potentially self-serving and unreliable" to allow them into evidence "without defendant ever having testified and submitted to cross-examination[.]" (*Ibid*.)

*Pollock* is inapposite. The concern there was that the defendant's statements were stale, self-serving and unreliable, and could not be admitted without giving the prosecution the ability to challenge them through cross-examination. But here, Doe testified and was exposed to cross-examination about Wright's actions and her physical condition during and after the course of events. Thus, unlike in *Pollock*, defense counsel here had a full opportunity to challenge the reliability of the statements she made during her forensic examination. Further, J.M. personally examined Doe, and Doe's statements to J.M. about the incident were made on the same day it occurred, giving them much more reliability and relevance than the defendant's statements in *Pollock*. *Pollock* does not compel us to hold the court erred by permitting J.M. to give her opinion that Doe suffered strangulation on the day in question. Wright otherwise cites no authority suggesting a forensic

---

5    Defense counsel sought to ask the expert: " '[H]ow does this binge cycle or pattern of use and abuse apply specifically to [defendant] in the days before the death of the [victims] and on the day of the death of the [victims]?' " (*People v. Pollock*, *supra*, 32 Cal.5th at p. 1172.)

13

expert's opinion is inadmissible unless based on objective evidence or supported by independent verification. His other cases do not involve medical practitioners who personally examined a victim and based opinions on the victim's statements during the examination.[6]

We need not further explore the issue, because even if we were to conclude the trial court erred by allowing J.M.'s opinion, we would hold the error harmless under the applicable standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (See *People v. Pearson* (2013) 56 Cal.4th 393, 446; *People v. Haro* (2021) 68 Cal.App.5th 776, 784 [improper admission of expert testimony is reviewed for prejudice under *Watson*].) "Under this standard, an error warrants reversal of the judgment only if the court determines that it is reasonably probable that a result more favorable to the appealing party

---

[6] In *Lockheed Litigation Cases, supra,* 115 Cal.App.4th 558, for example, an expert relied solely on a study to render a causation opinion that a class of plaintiffs' exposure to five chemicals increased the incidence of cancer. (*Id.* at pp. 562, 564.) The study's subjects were potentially exposed to more than 130 different chemicals, including known carcinogens. (*Ibid.*) The Court of Appeal upheld exclusion of the expert's opinion; the study provided no reasonable basis for the opinion that the exposure to the defendants' chemicals resulted in an increased risk of cancer. (*Id.* at p. 565.)

would have been reached in the absence of the error." (*Haro*, at p. 784; see also *Pearson*, at p. 446.)[7]

Citing *People v. Bledsoe* (1984) 36 Cal.3d 236 and *People v. Housley* (1992) 6 Cal.App.4th 947, Wright maintains the error cannot be harmless where the jury heard J.M.'s opinion "bolster[ing]" Doe's credibility and to which the jurors would accord "undue weight." But as we have explained, J.M. specifically testified it was not her role to pass on the truth of Doe's statements and the trial court instructed the jury they were not required to accept J.M.'s opinions as true or accurate, requiring us to presume the jury would not unquestioningly accept them. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 752 [jurors are generally presumed to follow the court's instructions].) Notably, in both *Bledsoe* and *Housely*, the courts found errors in admitting expert testimony harmless. (*Bledsoe*, at p. 252 [error in admitting rape counselor's testimony about rape trauma syndrome harmless where case against defendant was strong, victim immediately told

---

[7] We reject Wright's argument that we must apply the harmless beyond a reasonable doubt standard of prejudice under *Chapman v. California* (1967) 386 U.S. 18. He maintains this standard applies because his guilt was substantially dependent on J.M.'s expert testimony, which "reinforce[ed] the credibility of Doe's statements" and thereby compromised his due process rights to a jury determination of guilt beyond a reasonable doubt. In response to defense counsel's questions, J.M. specifically stated it was not her job to evaluate the truth of Doe's statements, and she explained she "didn't even attempt to ascertain whether those [statements] were true or not." Further, as stated above, the court instructed the jury that they were not required to accept the expert's opinions as true or accurate, they "must decide whether information on which the expert relied is true and accurate" and they "may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence." None of Wright's authorities, involving general principles of law such as the proof beyond a reasonable doubt standard (see *People v Lewis* (2009) 46 Cal.4th 1255, 1290), compel a different conclusion.

her friends she was attacked, and counsel's testimony "did little more than provide the jury with information that it either already had or that was not particularly pertinent to the facts of this case"]; *Housley*, at p. 959 [error harmless where child sexual abuse accommodation syndrome expert testified generally and several other witnesses explained the victim's retraction of her molestation claims].)

Here, the jury heard Doe testify that Wright was "choking" and "strangling" her with his hands around her neck, causing her to black out and urinate on herself. She described her injuries and testified to having short- and long-term memory loss. Defense counsel challenged Doe on cross-examination, and obtained J.M.'s concessions that Doe lacked visible injuries and that many of Doe's statements were subjective. Doe's trial testimony was consistent with what she had earlier related to J.M. The court instructed the jurors they could evaluate whether Doe's earlier statements were true if they were made, and it was for them to decide whether the information relied upon by J.M. was true and accurate. The jury plainly carefully considered Doe's testimony, as it acquitted Wright of false imprisonment. Doe's description of Wright's actions and what happened to her, combined with J.M.'s unchallenged general testimony concerning common indicia of strangulation, gave the jury an independent basis to conclude Doe was strangled by Wright on the day in question. Under these circumstances, it is not reasonably probable the outcome would have been more favorable to Wright had the court excluded J.M.'s specific opinion that Doe was strangled.

## II. *Custody Credits*

At Wright's sentencing hearing, neither the court nor counsel discussed custody credits. Wright's abstract of judgment reflects Wright received

16

credits for 1079 days in actual custody as well as 161 local conduct credits, a total of 1240 credits. (See *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48 [describing actual custody credits and conduct credits: "A defendant is entitled to actual custody credit for 'all days in custody' in county jail and residential treatment facilities, including partial days" and their calculation "begins on the day of arrest and continues through the day of sentencing"]; *People v. Valdes* (2020) 53 Cal.App.5th 953, 955; but see *People v. Ravaux* (2006) 142 Cal.App.4th 914, 919-920 [trial court correctly calculated custody credits from time from defendant's booking into jail rather than the time of his arrest or detention by police].)

Pointing out he was arrested on November 27, 2017, and sentenced on December 17, 2020, Wright contends he is entitled to an additional 44 days of credit (1117 actual custody credits and 167 conduct credits). He asks this court to modify the judgment to reflect the correct amount of credit. The People concede the point, and we agree. Wright's probation report indicates that police contacted Wright on the day of the incident, and "[h]e was then arrested and booked into the Banning Jail." Accordingly, the abstract of judgment should be modified to reflect 1284 days of custody credits. (See *People v. Gisbert* (2012) 205 Cal.App.4th 277, 282 [incorrect award of presentence custody credits is an unauthorized sentence that may be corrected at any time].)

### III. *Government Code Section 29550 Booking Fee*

At Wright's sentencing hearing, the court ordered Wright to pay specified fines, fees and assessments, including a $514.58 booking fee (Gov. Code, § 29550). The Legislature has since repealed and replaced Government Code section 29550 so that it no longer permits costs of that statute to be collected from defendants. (Gov. Code, § 29550, Assem. Bill No. 1869 (2019-

2020 Reg. Sess.) §§ 22, 23.)  It also enacted laws rendering imposed but unpaid booking fees as of July 1, 2021, uncollectible.  (§ 6111; see *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 952-953.)  Not only are any fees imposed under Government Code section 29550 that remain unpaid on and after July 1, 2021, unenforceable and uncollectible, but also any portion of a judgment imposing those costs " '*shall be vacated*.' "  (*Id.* at p. 953, quoting § 6111, subd. (a).)

Though the parties did not raise the issue and we could presume that there is no unpaid balance of Wright's booking fee, we will nevertheless order the booking fee order vacated to the extent it requires payment of any unpaid booking fees remaining on or after July 1, 2021.

DISPOSITION

The judgment is modified to vacate any portion of the $514.58 booking fee that remained unpaid as of July 1, 2021, and also to award Wright 1117 days of actual custody time and 167 days of conduct credit, for a total of 1284 days of credit. We direct the trial court to include the modifications in a corrected abstract of judgment, and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, we affirm the judgment.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.

19