Filed 6/2/23  P. v. Tatum CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093198 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F02254) |
| v. | |
| FREDRICK R. TATUM, | |
| Defendant and Appellant. | |

A jury found defendant Fredrick R. Tatum guilty of first degree murder, and then found him legally sane at the time he committed the murder.  In a bifurcated proceeding, the trial court found true defendant had suffered three prior strike convictions (Pen. Code, §§ 667, subds. (b)-(i), 1170.12) on March 19, 2002: two counts of forcible rape and one count of forcible oral copulation.[1]  The court sentenced defendant to 75 years to life in

---

[1]  Undesignated statutory references are to the Penal Code.

1

prison for his murder conviction (25 years to life tripled for the prior strike convictions) plus 5 years pursuant to section 667, subdivision (a)(1).

On appeal, defendant contends: (1) the trial court denied his rights to due process and a fair trial by not sanitizing the prior convictions that were used to impeach him; (2) the prosecutor committed misconduct in closing argument; (3) the trial court erred in allowing the prosecution's forensic psychiatry expert to testify regarding defendant's prior crimes during the sanity phase of trial; and (4) the court erred in its instruction under CALCRIM No. 3450. We will affirm the judgment.

## I. BACKGROUND

### A. *Guilt Phase Evidence*

On March 18, 2015, defendant began living in an emergency shelter at a motel. An organization called Turning Point Pathways took defendant to the motel and also provided him with a bus pass and gift cards for purchasing food. It was his full allotment of gift cards for the month. The organization provides support for individuals who are without housing and who also have a mental illness. At the time he became a member of Turning Point, defendant was homeless and had a mental health diagnosis. Turning Point did not allow guests in the rooms it paid for.

A personal service coordinator from Turning Point testified defendant was on her caseload for the month prior to his arrest. In that time, he usually called her at least 20 times per day. On March 23, 2015, defendant asked her for another gift card, but she refused because she had already given him his full allotment for the month. He asked again on April 1, but she said she could not provide any. She reminded him that he needed to re-register as a sex offender at his new address. He told her not to tell him what to do and then hung up on her. In another call that day, she told him he could not have guests and that he needed to tell his guests to leave or he would lose his placement. He told her she needed to tell his guests to leave. He hung up on her again. Later that

2

day, defendant came to Turning Point's office and yelled at his coordinator. He demanded more gift cards and bus passes, and he was told there were none.

On April 2, 2015, defendant's coordinator discovered that the organization was providing food and housing for defendant even though he was obtaining benefits from other sources. She told him that Turning Point would no longer provide him with gift cards. He said she "didn't know what [she] was talking about, and that he's a special case to [Turning Point] and they owe him."

On the morning of April 8, 2015, defendant called a supervisor at Turning Point. He sounded "really angry and bitter" and "went on a tirade about multiple things." He complained about a woman who had kicked him in the groin, stolen a benefits card, and accused him of rape. He complained that Turning Point had not done enough for him to succeed and that the computer the supervisor had purchased for him was not provided in a timely manner.

A few hours later, the victim's decomposing body was found in defendant's motel room.

A forensic pathologist opined that the victim died from blunt force asphyxia. The victim's injuries included a fractured jaw, a fractured larynx, and multiple rib fractures. Her left lung and liver were lacerated.

Defendant testified that, on the morning of April 6, 2015, after he and the victim woke up, he asked her where his money and card were. She did not respond. He told her he was getting ready to call the police. The victim responded by kicking, hitting, punching, and scratching him. She also screamed "rape." Defendant replied that he never touched her. Defendant testified he "grabbed her around her ribs and her arms and held onto her and [they] kept wrestling, and she was wrestling with [him] back and forth" for 30 to 45 minutes. He said they fell down together a couple of times. He did not fight back but rather tried to hold her down and prevent her from kicking and punching. Defendant testified he was afraid because the victim was having an aneurysm and blood

3

was coming out of her nose and face: "I was afraid something would happen to me because of her being in my room." Defendant said he passed out and had seizures. After he woke up, the victim was on the bed and he thought she was sleeping.

B.      *Sanity Phase Evidence*

Dr. Xia testified as an expert in psychiatry and diagnosis of mental illness for the defense. He had worked with Turning Point and first examined defendant in March 2014. Defendant had previously been diagnosed with bipolar disorder and substance dependence. Defendant had also been prescribed a mood stabilizer. Dr. Xia never made his own final diagnosis because defendant refused to undergo drug testing.

Dr. Faizi testified as the prosecution's expert in forensic psychiatry. She conducted a forensic interview of defendant on March 10, 2020, that included a mental status examination.

Dr. Faizi opined that, at the time of the murder, defendant met the diagnostic criteria for stimulant intoxication, stimulant use disorder of moderate severity, and adult antisocial behavior. Dr. Faizi also concluded defendant malingered symptoms of mental illness during the interview to be found not guilty by reason of insanity. She explained she did not find that he met the criteria for a diagnosis of bipolar disorder.

In Dr. Faizi's opinion, defendant understood the nature and quality of his actions and could distinguish between right and wrong at the time of the murder. Dr. Faizi's opinion was based on several factors, including defendant's own account of the murder, which reflected the understanding that punching someone can result in injury or death. Additionally, defendant stated he had been involved in different domestic violence incidents and knew that assaulting someone was wrong. Dr. Faizi explained, "There was no psychotic process that he had that would better explain any alternative version of what had occurred." Dr. Faizi also noted defendant's seizures were never documented and his description of them was vague.

4

## II. DISCUSSION

### A.    *Guilt Phase Issues*

####    1.    *Impeachment with Prior Convictions for Offenses of Moral Turpitude*

#####        a.    *Trial Court Proceedings*

Prior to trial, the prosecution moved to admit defendant's convictions for offenses involving moral turpitude for impeachment purposes, should he elect to testify. In admitting the evidence, the trial court expressly considered the remoteness of the prior convictions and explained that defendant's conviction for a battery causing substantial bodily harm committed in 1997 was not remote in time, and his 2002 and 2013 felony convictions "also would be appropriate." The latter felony conviction was for dependent adult abuse. The 2002 felony convictions were the aforementioned convictions for forcible rape and forcible oral copulation, as well as a conviction for false imprisonment.

On cross examination, defendant admitted he had pled guilty to one count of battery causing substantial bodily harm, two counts of forcible rape, one count of forcible oral copulation, one count of false imprisonment, and one count of dependent adult abuse, all of which were felonies. He also testified to the dates on which he pled guilty. He acknowledged the convictions and their dates on direct examination as well.

The jurors were instructed that if they found a witness had been convicted of a felony, they "may consider that fact only in evaluating the credibility of the witness's testimony."

#####        b.    *Evidence Code Section 352 and Request to Sanitize Convictions*

"After the 1982 adoption of article I, section 28, subdivision (f), [now (f)(4)] of the California Constitution, a witness may be impeached with any prior felony conviction involving moral turpitude, subject to the trial court's discretion under Evidence Code section 352 to exclude it if it finds its prejudicial effect substantially outweighs its probative value. [Citation.] The court's ruling is reviewed for abuse of discretion. [Citation.] Because this discretion is broad, 'a reviewing court ordinarily will uphold the

trial court's exercise of discretion.' " (*People v. Anderson* (2018) 5 Cal.5th 372, 407.) Defendant does not dispute that the convictions at issue involved moral turpitude.

"When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify." (*People v. Clark* (2011) 52 Cal.4th 856, 931, citing *People v. Beagle* (1972) 6 Cal.3d 441, 453.) "[T]he last *Beagle* factor . . . has no application in this case because defendant actually took the stand and suffered impeachment with the priors." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 926.)

Defendant argues the trial court denied his rights to due process and a fair trial by denying his request to sanitize his prior convictions by referring to each only as "a felony of moral turpitude." He also contends the trial court erred in failing to conduct a "full [Evidence Code section] 352 analysis." These arguments are unpersuasive.

" '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 344; see also *People v. Villatoro* (2012) 54 Cal.4th 1152, 1168 [reviewing court can " 'infer an implicit weighing by the trial court on the basis of record indications *well short* of an express statement' "].) Here, the record reflects defendant's trial counsel asked for an analysis under Evidence Code section 352 and the *Beagle* factors, and later acknowledged the section 352 analysis "has been done." Defendant's assertion on appeal that the trial court "failed to expressly engage[] in the appropriate balancing analysis under Evidence Code section 352" is misplaced.

Defendant's contention that the trial court erred by not sanitizing his prior convictions is also incorrect. Defendant argues the prior convictions were similar to the current charges and what he characterizes as "the uncharged rape" claimed by the victim

6

and therefore the jury would inevitably use the evidence to show a propensity for committing assault, and thus that he committed the charged offense.  The authority he cites to support this point does not apply the controlling law.  (See *People v. Barrick* (1982) 33 Cal.3d 115, superseded as stated in *People v. Castro* (1985) 38 Cal.3d 301, 308.)  "Although the similarity between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive."  (*People v. Clark, supra*, 52 Cal.4th at p. 932.)  As the People note, the prosecutor did not allege or argue defendant had raped the victim, and the jury would have had to speculate about the similarity of the prior convictions.  "Any prejudice was minimized by the fact that the evidence referred only to the bare fact of the convictions with nothing more."  (*People v. Carkhum-Murphy* (2019) 41 Cal.App.5th 289, 298.)  The jury was also instructed that it could consider the felonies only in evaluating defendant's credibility and we presume the jury followed the court's instruction.  (*People v. Gutierrez* (2018) 28 Cal.App.5th 85, 91.)

Defendant notes that at least one conviction was remote and complains the trial court allowed the admission of six similar convictions.  " 'Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior.' "  (*People v. Anderson, supra*, 5 Cal.5th at p. 408.)  Likewise, the fact that the defendant had multiple convictions "did not compel the court to exclude any of them."  (*Ibid*.)  Indeed, "a series of crimes may be more probative of credibility than a single crime."  (*People v. Clark, supra*, 52 Cal.4th at p. 932.)

There is no requirement that a court must sanitize a prior felony conviction, even if the prior offense is similar to the charged crime.  (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139.)  By precluding any reference to the precise offense, the court prevents "*direct* prejudice" to a defendant, but "removes one risk of harm only to create a number of others equally grave."  (*People v. Rollo* (1977) 20 Cal.3d 109, 119, superseded by statute on another point as recognized in *People v. Castro, supra*, 38 Cal.3d at p. 308.)

7

Sanitizing the offense may infringe on the jury's role as "arbiter of the probative effect" of the convictions upon the defendant's credibility and invite the jury's speculation about the nature of the offense. (*Rollo, supra,* at pp. 118-119.) The court did not abuse its discretion by declining to sanitize the prior convictions.

### 2. *Alleged Prosecutorial Misconduct*

Defendant asserts the prosecutor committed multiple acts of misconduct during closing argument. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury. Furthermore, and particularly pertinent here, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Morales* (2001) 25 Cal.4th 34, 44.)

"Regarding the scope of permissible prosecutorial argument, ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Stanley* (2006) 39 Cal.4th 913, 951-952.) " 'A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1021.)

The People argue defendant forfeited his claim of prosecutorial misconduct by failing to raise timely objections. " ' "To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument." ' " (*People v. Charles* (2015)

61 Cal.4th 308, 327.) Defendant argues that, to the extent his trial counsel failed to properly or adequately object to the prosecutor's conduct, he was denied effective assistance of counsel. To establish a claim of ineffective assistance of counsel, defendant must show: (1) trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) The People argue that even if we consider the prosecutorial misconduct claim in this context, it still fails because the prosecutor's remarks were neither improper nor prejudicial. As we will discuss, the People are correct. Thus, rather than decide the forfeiture issue, we reach the merits, because they are dispositive of both alternative contentions.

> a. *Allegedly Prejudicing Jury Against Defendant*

Defendant argues the prosecutor committed misconduct by prejudicing the jury against him by presenting him "as someone seeking to game to the system" and "pandering to commonly held prejudices against people who make use of governmental benefits." We disagree that the prosecutor committed misconduct.

Several of defendant's examples are taken out of context. For instance, the prosecutor noted Turning Point was paying for defendant's hotel room as part of a discussion about how the victim being found dead in the room was a problem for defendant: "His name is on the hotel room. Turning Point is paying for that hotel room. There's no getting out of this one. He's smart enough to know that, so he fabricates a defense."

The prosecutor noted a March 22, 2013 emergency room visit in which "a battery of expensive tests" were performed, "only to find [defendant] had an infection" and needed antibiotics. This argument was not, as defendant contends, a suggestion that

9

defendant "wasted taxpayer money" to prejudice the jury against him. Rather, the prosecutor was arguing defendant was not credible.

Defense counsel successfully interposed an objection to commentary about defendant's benefits during a subsequent discussion of defendant's motive:[2]

"[Prosecutor]: [The victim] was going to report him for rape. He was not going to let that happen. That's why he killed her. He has to take care of this threat to his liberty and his freedom to navigate our system better than a navy captain can navigate an ocean. He has his captain. He does not want to go to jail. He very much likes his life. He gets better health care than many of us, better benefits than many of us.

"[Defense counsel]: Objection, Your Honor.

"THE COURT: Sustained.

"[Prosecutor]: He enjoys it. He does not want to go back."

Relatedly, the prosecutor argued defendant's motive was personal and reflected in the method of killing: "There's nothing more brutal and personal for [defendant] than to say your perfect life where you get hous[ing] for free, where everyone takes care of it, drives you around like you are royalty. The government puts money on your card, you get free bus pass, Turning Point buys you computers and enrolls you in college. Your perfect life is going to come to [an] end because [the victim] is going to accuse you of rape, whether it's true or not."

The prosecutor argued that when defendant "needs food, he knows where to get it" and seemed to be "navigating the system pretty well" as part of an argument that

---

[2]  Defendant's opening brief does not address the fact defendant did not request an admonition after its successful objection. On reply, defendant suggests a request for a curative instruction would have been futile "given the timing of the prosecution's comments during closing and rebuttal arguments, leaving the comments fresh in the jurors' minds entering deliberations." Defendant cites no authority supporting this proposition, which would effectively erase the need to request an admonishment after any successful objection to closing argument.

defendant was attempting to avoid fault for the murder by manufacturing excuses such as being off his medication when all objective signs indicated he was doing well.

A prosecutor is entitled to attack the sincerity of the defendant's testimony and to use " ' "[h]arsh and colorful" ' allusions in doing so." (*People v. Shazier* (2014) 60 Cal.4th 109, 146.) The prosecutor used harsh and colorful language to argue, based on the evidence, defendant had a motive for committing the murder and he was not credible. This was not misconduct.

### b. Defendant's Belief the Victim Would Accuse Him of Rape

The prosecutor explained that defendant was not charged with rape and whether he did rape the victim did not matter: "What matters is this, that was exactly what his motive was." The prosecutor continued: "Let's briefly talk about this rape allegation. [¶] I'm the first person to tell you, I cannot prove he raped her and that's why rape is not charged in this case." Defense counsel objected that there was no evidence "on the rape count." The court said, "Let's not talk about what is not before this jury." The prosecutor explained she wanted "to talk about why we had some evidence regarding this, though." After a conference outside the jury's presence, the court sustained the objection. Thereafter, the prosecutor moved on, stating: "At the end of the day, this trial is not about that."

Defendant argues the prosecutor referred to facts not in evidence by resurrecting an allegation that defendant had raped the victim. We disagree. "Counsel is not permitted to 'assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]'; however, the reasonableness of inferences counsel draws from matters in evidence ' " 'is for the jury to decide.' " ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 787.) We conclude the prosecutor's comments were permissible because they " 'did not mischaracterize or assume facts not in evidence, but merely commented on the evidence and made permissible inferences.' " (*Ibid*.) We also must view the remarks in context. (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) In

11

context, the remarks made by the prosecutor contained reasonable inferences from the evidence and did not state evidence not in the record.

### c. Statements Regarding Prior Convictions

Defendant argues the prosecutor impermissibly used prior conviction evidence as propensity evidence. This assertion is incorrect. The prosecutor mentioned the prior convictions in the context of discussing the credibility of a hypothetical storyteller: "[A]fter you hear his story, you learned he's been convicted of two rapes, false imprisonment, forced oral copulation, . . . battery causing substantial harm and dependent-adult abuse. . . . You don't trust some people that have that background especially when the evidence point[s] somewhere else and the guy gets up and tells us something different." This was proper argument and the jury was instructed it could consider the felony convictions only in evaluating defendant's credibility. We presume the jury followed those instructions. (*People v. Gutierrez, supra*, 28 Cal.App.5th at p. 91.)

### d. Statement Regarding Defendant's Need for Medication

Defendant argues the prosecutor acted as her own expert when she stated, "None of this is his fault. He was off his meds, even though he probably does not really need them. He's been off of them for over a month and he seems to be navigating the system pretty well." Defendant cites no authority to support his argument. We agree with the People that it is not reasonably probable the jury understood this comment as expert opinion on the part of the prosecutor rather than as an attempt to persuade. We cannot conclude there is a reasonable likelihood the jury construed or applied the remark in an objectional fashion.

### e. Alleged Misstatement of the Law

Defendant argues the prosecutor committed misconduct by misstating the law in two respects during closing argument. Neither claim has merit.

12

It is improper for a prosecutor to misstate the law. (*People v. Centeno, supra*, 60 Cal.4th at p. 666.) However, "[w]hen attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Id.* at p. 667.)

Defendant contends the prosecutor misstated the law and misled the jury by stating "even though you get to the instructions for the lesser crimes, the judge is not expressing the quality of the evidence or even if these lessers apply." Defendant suggests this was a misstatement of the law because the court would not have given the instructions if substantial evidence did not support them. (See *People v. Huggins* (2006) 38 Cal.4th 175, 215 [trial court has sua sponte duty to instruct on lesser offense "whenever there is substantial evidence raising a question as to whether all of the elements of the charged greater offense are present"].) The prosecutor did not specifically state that substantial evidence did not support the giving of the lesser included instructions. Further, the prosecutor's argument continued, "Even if the defendant got up and said she shot me with a machine gun and, therefore, I used [self-]defense, that instruction is given. The judge cannot tell you to believe a defendant. It is your job to make that decision." Taken as a whole, the prosecutor's comments were similar to the jury's instructions. The jury was instructed that "[i]t is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial." The jury was told that some of the instructions "may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." The jury was also instructed that

13

it should not take anything the court said or did during the trial as an indication of what it thought about the facts, the witnesses, or what the verdict should be. In the context of the whole argument and the instructions, we cannot conclude there was a reasonable likelihood the jury understood or applied the prosecutor's comments in an improper or erroneous manner.

Defendant further argues the prosecutor misstated the law when she explained the instructions on voluntary manslaughter based on heat of passion. The jury was instructed that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion, including the requirement that "the defendant acted *rashly* and under the influence of intense emotion that obscured his reasoning or judgment." (CALCRIM No. 570, italics added.) Defendant contends the prosecutor misstated the law by stating "*in*voluntary manslaughter, heat of passion" requires that the defendant "acted *rationally* and under the influence of intense emotion that obscured judgment." (Italics added.)

We conclude there was not a reasonable likelihood the jury understood or applied the complained of comments in an erroneous manner.

" 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' " (*People v. Centeno, supra*, 60 Cal.4th at p. 676.) Here, "the trial court properly instructed the jury on the law, and we presume the jury followed those instructions. Indeed, the jury was instructed that, to the extent the law as given by the trial court conflicted with the description of the law as given by the attorneys, the jury was to follow the court's instructions." (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)

14

### f. Alleged Appeals to Bias and Sympathy

Defendant argues the prosecutor improperly relied on appeals to bias and sympathy toward the victim. Defendant does not cite any authority to support this argument. It is true that "a prosecutor generally may not appeal to sympathy for the victims by exhorting the jurors to step into the victims' shoes and imagine their thoughts and feelings as crimes were committed against them." (*People v. Shazier, supra*, 60 Cal.4th at p. 146.) However, that is not what happened here.

The prosecutor argued, "The injuries on [defendant] is from a person who's fighting for their life. They are defensive type wounds, scratches, abrasions, superficial bruises. It is like my puppy being attacked." Defense counsel objected and the court told the prosecutor to "[m]ove on." The prosecutor then continued, "The injuries on her, if they had a voice, they would say, I'm killing you. You are weak. Your attempt to fight back is easily overcome . . . ." The court overruled defense counsel's objection to this comment and again told the prosecutor to move on. The court also overruled an objection to the following comment from the prosecutor: "Defendant is very good at manipulating the system and the question you need to ask yourselves: Can he manipulate you?"

Defendant argues the prosecutor relied on blatant appeals to the jury's bias and sympathy by analogizing the injuries the victim inflicted on defendant to a puppy's efforts to defend itself and personifying the victim's wounds by telling the jury what they would say. As the People explain, the prosecutor was inferring based on the evidence and commenting on the discrepancies between their injuries to argue defendant's claim that the victim was attacking him was false.

With respect to the comments regarding defendant's manipulation, our Supreme Court has explained that similar comments are not misconduct. (See *People v. Shazier, supra*, 60 Cal.4th at p. 145 [" 'you have been groomed through the testimony of [defendant] trying to say everything that he should say, trying to play on emotions, trying

to show that everything is different now. The grooming behavior, the manipulation, it still continues' "].)

Defendant has not demonstrated any of the alleged appeals to the jury's bias or sympathy constituted prosecutorial misconduct.

We reject all of defendant's claims of prosecutorial misconduct.

## C.    *Sanity Phase Issues*

### 1.    *Expert Testimony*

The prosecution's expert, Dr. Faizi, testified she reviewed police records related to defendant's criminal history so that she could ask his interpretation of what happened and determine if his offenses were attributable to his being legally insane. Dr. Faizi read from a police report related to defendant's 2002 convictions. Dr. Faizi stated defendant "was accused by his ex-roommate that she went to his house to retrieve her belongings. He did not allow her to leave, threatened her with a gun, threatened to kill her and forcibly raped her." Dr. Faizi added that "the coordinator at U.C. Davis Division of Psychiatry, . . . heard, I believe, [the ex-roommate's] sister came to the scene and he assaulted her as well."

Dr. Faizi read from a police report indicating that, in 1997, defendant was found with one-half of a gram of rock cocaine. Further, defendant fought with officers at the time of his arrest and bit an off-duty police officer.

Defense counsel objected to this testimony based on Evidence Code section 352. The court overruled the objection but limited the testimony to the facts on which the expert relied.

Thereafter, Dr. Faizi explained the uncharged 1997 incident was important for her opinion because it supported the fact defendant had been involved with substances "for quite a duration of time."

Dr. Faizi testified to a police report, also from 1997, indicating defendant was involved in an altercation with his aunt and his girlfriend that resulted in his felony

16

conviction for battery causing substantial bodily harm. Dr. Faizi testified, "During this incident, [defendant] allegedly battered his girlfriend with his fists. He use[d] a large metal chain on the outer side of her leg area and used a chain to strike his aunt around the rib cage area."

Dr. Faizi further testified that defendant's dependent adult abuse conviction arose out of an incident in 2009 in which defendant was a caretaker and attacked the person he was caring for by holding his charge on the ground and putting his hands around his charge's neck. Defendant told his charge he would not be found responsible because he "ha[d] been certified legally insane."

### a. Evidence Code Section 352

Defendant argues the court erred in admitting the evidence because its prejudicial effect under Evidence Code section 352 substantially outweighed its probative value. He asserts the detail presented allowed the expert to paint a picture of defendant "as extremely dangerous, engaging in crimes which undoubtedly resonated with the jury in their brutality, but which were unrelated to" the issue of sanity. This argument is unpersuasive. The uncharged drug possession was relevant to show the length of time defendant had used drugs and the fact he had kept using drugs despite legal consequences, both of which were factors the expert cited in diagnosing defendant with stimulant use disorder. Additionally, evidence of prior convictions is admissible in a sanity hearing and a proper subject of consideration by experts. (*People v. Martinez* (1973) 31 Cal.App.3d 355, 358.) Moreover, the potential for prejudice is limited. (See *People v. Houser* (1965) 238 Cal.App.2d 930, 933 ["There occurs to us no cogent reason to expect that prejudice in a sanity hearing would be incited to the point of unfairness by knowledge of defendant's criminal record"].) Furthermore, contrary to defendant's suggestion that Dr. Faizi did not reach any conclusions based on this information, Dr. Faizi explained she "did not note any irrational explanations or psychotic driven explanations when [defendant] was . . . discussing the actual incident at hand, *or any of*

17

*the past incidents*." (Italics added.) Rather, Dr. Faizi found defendant minimized his past legal problems. We reject defendant's assertion that the trial court erred by not excluding the evidence under Evidence Code section 352.

        b.     *Sanchez*

On appeal, defendant argues the expert's reliance on hearsay was error under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), which held that an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.) In the trial court, defendant only objected to the testimony on the basis of Evidence Code section 352. "[T]he 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable." (*People v. Seijas* (2005) 36 Cal.4th 291, 302.) " ' "The reason for the [objection] requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." ' " (*People v. Perez* (2020) 9 Cal.5th 1, 7.) "[A]n objection under Evidence Code section 352 is completely different from a *Sanchez* objection that the expert has 'relate[d] as true case-specific facts asserted in hearsay statements.' " (*Id*. at p. 14.) As such, defendant's failure to raise an objection in the trial court under *Sanchez* requires us to conclude any *Sanchez* objection is forfeited.

Defendant argues that to the extent his trial counsel did not adequately object, his trial counsel rendered ineffective assistance. We conclude defendant has failed to show a deficient performance.

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail

on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai, supra*, 57 Cal.4th at p. 1009.)

It would have been reasonable, as the People suggest, for trial counsel to have concluded that it would rather have the expert testify as to the hearsay than to hear additional testimony about the prior offenses and strengthen the expert's testimony. Counsel may have also reasonably concluded that additional testimony would not be advantageous and could potentially be worse for defendant. Defendant has failed to demonstrate his counsel lacked a rational tactical purpose for failing to make a *Sanchez* objection.

### 2. Trial Court's Misreading of CALCRIM No. 3450

The jury was instructed with CALCRIM No. 3450 that it must decide whether defendant was legally insane when he committed the murder:

"The defendant must prove that it is more likely than not that he was legally insane when he committed the crime.

"The defendant was legally insane if:

"1. When he committed the crime, he had a mental disease or defect;

"AND

"2. Because of that disease or defect, he was incapable of knowing or understanding the nature and quality of his act, or was incapable of knowing or understanding that his act was morally or legally wrong." (CALCRIM No. 3450.)

The jury was additionally instructed with the following bracketed portion of CALCRIM No. 3450: "Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal

19

insanity.  This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off.  Likewise, a temporary mental condition caused by a recent use of drugs or intoxicants is not legal insanity.  [¶]  If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental illness or defect combined with another mental disease or defect may qualify as legal insanity.  A *settled mental disease or defect* is one that remains after the effect of the drugs or intoxicants has worn off."

The jury was provided with copies of these written instructions.  Defendant argues the trial court erred in orally instructing the jury when it misread part of the bracketed instruction to say "subtle" instead of "settled":

"If the defendant suffers from a *subtle* mental disease or defect caused by the long-term use of drugs or intoxicants, that *subtle* disease or defect combined with another mental disease or defect may quality as legal insanity.  A *subtle* mental disease or defect is one that remains after the effects of the drugs or intoxicants have worn off."[3]  (Italics added.)

Defendant concedes the written instructions were correct.  He argues to the extent his trial counsel failed to preserve the issue for appeal by adequately objecting, he was denied effective assistance of counsel.  On this record, we cannot conclude trial counsel rendered ineffective assistance.  Given the words "subtle" and "settled" sound similar, it is likely the mistake is with the reporting of the trial court's words rather than what the trial court said.  Defendant's suggestion that such a mistake is impossible because a court reporter would have been familiar with the instruction is unconvincing.  However, even if

---

[3]  Earlier in its reading, the trial court read "severe mental disease or defect" instead of "settled mental disease or defect."

20

we assume the transcript is accurate and the issue is preserved, there is no basis for reversal.

"The risk of a discrepancy between the orally delivered and the written instructions exists in every trial, and verdicts are not undermined by the mere fact the trial court misspoke. 'We of course presume "that jurors understand and follow the court's instructions." [Citation.] This presumption includes the written instructions. [Citation.] To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control.' " (*People v. Mills* (2010) 48 Cal.4th 158, 200-201.)

"Even if we did not assume that the jury understood that the written instructions were controlling, we would find no reasonable likelihood that the jury misunderstood the requirements [at issue]. 'When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 729.) While "subtle" and "settled" by themselves are words with different meanings, the allegedly erroneous oral instruction defined "subtle mental disease or defect" as "one that remains after the effects of the drugs or intoxicants have worn off." Likewise, the written instruction defined "settled mental disease or defect" to be "one that remains after the effect of the drugs or intoxicants has worn off." Thus, it was not reasonably likely that the jury, if it heard the court say "subtle mental disease or defect," misapplied the challenged instruction because the jury was provided with a definition that was accurate for purposes of the instructions.

## III.  DISPOSITION

The judgment is affirmed.


/S/

—————————————————
RENNER, J.


We concur:


/S/

—————————————
HULL, Acting P. J.


/S/

—————————————
KRAUSE, J.